IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

| | |
|---|---|
| Christopher Bruce and )<br>Amalgamated Transit Union, )<br>         )<br>   Plaintiffs, )<br>         )<br>       v. )<br>         )<br>Worcester Regional Transit Authority )<br>and Central Mass Transit Management, )<br>Inc.; and David Trabucco, James Parker, )<br>and Jonathan Church, in their individual )<br>and official capacities, )<br>         )<br>   Defendants. ) | Case No. 4:18-cv-40037<br><br>Jury Demand |

## COMPLAINT

1. The Amalgamated Transit Union (ATU), an international union whose affiliate local, ATU Local 22, is the exclusive representative of all non-supervisory employees of Defendant Central Mass Transit Management, Inc. (CMTM), and Christopher Bruce, the President of ATU Local 22, bring this suit pursuant to 42 U.S.C. § 1983, M.G.L. ch. 12, § 11I, and the common law of Massachusetts, to enforce their rights to freedom of speech and freedom of association under the First and Fourteenth Amendments of the United States Constitution and Article XVI of the Massachusetts Constitution. ATU and Bruce allege that the defendants have violated their First Amendment and Article XVI rights by suspending and firing Bruce under an unlawful policy that threatens Worcester Regional Transit Authority (WRTA) bus drivers with suspension and termination if they speak to the news media. ATU and Bruce allege in the alternative that Defendants David Trabucco and James Parker tortiously interfered with Bruce's employment relationship. ATU and Bruce seek preliminary and permanent injunctive relief as well as damages, fees, and costs.

1

**Parties**

2. Plaintiff ATU is an international labor organization that represents transit workers throughout the United States and Canada. Its local affiliate, ATU Local 22, represents bus drivers and other employees of CMTM and the WRTA. All members of ATU Local 22, including Christopher Bruce, are also members of Plaintiff ATU.

3. Plaintiff Christopher Bruce is the President of ATU Local 22. He was an employee of the WRTA for over 40 years until his recent firing. At the time of his firing, his job duties consisted mainly of driving empty, out-of-service buses to and from the Hub (Worcester's central bus station).

4. Defendant WRTA is a regional transit authority and a body politic and corporate, created pursuant to M.G.L. ch. 161B, § 3. It owns and manages the public transit system in and around Worcester, Massachusetts. It is a political subdivision of the Commonwealth of Massachusetts.

5. Defendant CMTM is a Massachusetts corporation with an office and principal place of business in Worcester, Massachusetts. CMTM operates buses owned by WRTA.

6. Defendant David Trabucco is an Operations Manager for CMTM. He has final policymaking authority over the terms and conditions of employment of WRTA bus drivers.

7. Defendant James Parker is the General Manager of CMTM. He has final policymaking authority over the terms and conditions of employment of WRTA bus drivers.

8. Defendant Jonathan Church is the Administrator of the WRTA. He has final policymaking authority over the terms and conditions of employment of WRTA bus drivers.

**Jurisdiction and Venue**

9. The Court has jurisdiction over the federal law claims in this case pursuant to 28 U.S.C. §§ 1331 and 1343 because they arise under the Constitution and laws of the United States, namely the First Amendment, Fourteenth Amendment, and 42 U.S.C. § 1983.

10. The Court has supplemental jurisdiction over the state law claims in this case pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

11. Venue is proper in the District of Massachusetts under 28 U.S.C. § 1391 because the defendants are located in this district and all the events and omissions giving rise to the claims occurred in this district.

**Facts: Relationship between WRTA and CMTM**

12. The WRTA is responsible for managing the Worcester area mass transit system. To that end, the WRTA owns or leases all vehicles and physical plants used in the operation of the Worcester area mass transit system; sets fares; approves or denies proposed changes in public transit service; contracts with private corporations for the day-to-day operations of its buses; and ensures that the private corporations it contracts with, including CMTM, comply with certain terms and conditions of employment for public transportation employees as set out by law.

13. Currently the WRTA contracts with CMTM for the day-to-day operation of the Worcester area bus system.

14. Prior to its contract with CMTM, the WRTA contracted with other private corporations for day-to-day operation of buses. Although the corporations contracting with the WRTA have changed, the management personnel who supervise bus drivers have often remained the same despite the change-over in contractors.

15. There is a "revolving door" between the WRTA itself and the corporations such as CMTM with which it contracts. For example, Defendant James Parker, currently a General Manager of CMTM, was previously an assistant operations manager for WRTA; and Defendant David Trabucco, currently Operations Manager for CMTM, simultaneously holds himself out as Operations Manager for the WRTA.

16. The WRTA through its Advisory Board receives public comment on the job performance of bus drivers and responds to such public comment by ensuring that its private contractors, such as CMTM, are properly managing employees.

17. All of CMTM's operations occur on land and physical plants that the WRTA owns (or leases), manages, repairs, and improves.

18. CMTM's entire business consists of operating and maintaining the WRTA's bus transit system, and CMTM was formed for the sole purpose of contracting to perform this duty for the WRTA.

19. Without continued business from the WRTA, CMTM would likely cease to exist.

20. The WRTA gets the benefit of CMTM's employment policies and decisions.

21. Based on the facts set out above, the WRTA is entwined in the management and control of CMTM.

22. In addition and in the alternative, operating a mass transit system open to the public is a traditionally public function reserved exclusively to the state.

### Facts: CMTM's Employment Policies

23. CMTM, pursuant to its contract with the WRTA, maintains employment policies that govern the terms and conditions of employment for WRTA bus drivers.

24. CMTM has the power to discipline and discharge WRTA bus drivers for violating CMTM's employment policies.

25. According to CMTM's employment policies, disciplinary infractions are categorized according to their seriousness as "Class I" (most serious), "Class II" (very serious), and "Class III" (less serious).

26. Class II infractions, according to a written policy that CMTM distributes to employees, cover "very serious situations that may result in discharge" of an employee. According to the same policies, CMTM states it will suspend employees the first time they commit a Class II infraction and discharge them the second time they commit a Class II infraction.

27. According to the same written policy that CMTM distributes to employees, "Making Unauthorized Statements to the Media" is a Class II infraction that may result in immediate discharge.

28. The same policy states, "All statements in which an employee is representing CMTM or WRTA must be pre-approved by the General Manager," but nowhere defines what it means for employees to "represent[] CMTM or WRTA" when they speak to the media.

**Facts: Plaintiff Christopher Bruce Talks to the Media about Impending Service Cuts**

29. The WRTA manages the Central Hub (Hub), a bus stop and public transit center located at 60 Foster Street in Worcester, Massachusetts.

30. The Hub is WRTA property.

31. Pursuant to its contract with the WRTA, CMTM operates buses out of the Hub.

32. Recently there has been much public discussion in and around Worcester about the possibility of service cuts to the WRTA's bus service.

33. Specifically, on about January 18, 2018, at a public board meeting, WRTA Advisory Board members and Defendant Church discussed the possibility of cutting bus service and eliminating jobs. The January 18 meeting received news coverage from the news media in the Worcester area and beyond.

34. The WRTA, CMTM, and ATU Local 22 share an interest in increased funding for public transit.

35. Accordingly, within a few days of the January 18 board meeting, the WRTA and CMTM authorized WRTA bus drivers to distribute flyers to members of the public on Hub property, while in uniform.

36. The flyers alerted the public to budget shortfalls and the possibility of service cuts, and requested the public's assistance in demanding that the state allocate more money to the WRTA.

37. Starting on about January 22, 2018, several WRTA bus drivers began distributing such flyers to the public on Hub property. They distributed the flyers openly and in uniform, and their leafleting activities were plainly visible to their fellow employees including Plaintiff Bruce.

38. The WRTA and CMTM failed to inform the WRTA bus drivers as a whole, including Bruce, that they were permitting only certain employees to communicate with the public on Hub property about the impending service cuts.

39. On about February 6, 2018, following a phone conversation with Bruce, a camera news crew from Telemundo arrived at the Hub to interview WRTA employees and members of the public about the possibility of service cuts.

40. Plaintiff Bruce allowed the Telemundo camera crew to interview him on an out-of-service bus, which he drove slowly around the Hub lot a single time while giving statements to the Telemundo reporter.

41. The Telemundo news segment about WRTA service cuts aired on February 6, 2018 on Telemundo's New England regional television stations and website. The news segment featured Plaintiff Bruce for about five seconds.

42. In the news segment that aired, Bruce answers questions from Arianne Alcorta, a Telemundo reporter, while slowly driving an empty, out-of-service bus. Bruce is prominently identified as "Presidente del Sindicato" (union president) by a graphic on the screen. His only audible statement is, "So the loser is gonna be the public."

43. The news segment has a pro-labor, pro-consumer point of view. It focuses on how the WRTA has already raised fares, service is already poor, and many employees stand to lose their jobs. Reporter Alcorta concludes the segment by stating that ATU Local 22 is planning additional steps.

44. The overall impression given by the Telemundo news segment is that the ATU is taking the lead in a fight to protect workers and the public.

45. During the segment, Bruce voiced his personal opinion as Local President on a matter of public concern. Bruce did not hold himself out as "representing CMTM or WRTA," nor did the news segment (over which he had no control anyway) present him as such.

46. On the same visit to the Hub on February 6, 2018, Telemundo also interviewed other bus drivers and members of the public. The other drivers interviewed were also in uniform.

47. One such driver, David Tello, was also depicted in the Telemundo news segment. He sat in the driver seat on an empty bus and commented in Spanish on funding cuts and the possibility of layoffs.

### Facts: Defendants Suspend and Fire Bruce Because of His Speech

48. On about February 7, 2018, Defendant David Trabucco suspended Plaintiff Bruce—the President of ATU Local 22.

49. Although on at least one other occasion WRTA bus drivers have permitted members of the media to board their buses and film and photograph them operating their buses, Defendants have not previously disciplined WRTA bus drivers for doing so.

50. In the written notice of suspension provided to Bruce, Defendant Trabucco informed him that by speaking to a member of the news media, Bruce allegedly violated three employment policies. Trabucco listed the policies as "Failure to Follow Work Orders or Procedures"; "Making Unauthorized Statements to the Media (Newspapers, TV, Radio, etc.): ALL [sic] statements in which an employee is representing CMTM or WRTA must be pre-approved by the General Manager."; and "Willful or Deliberate Violation of or Disregard of Safety Rules or Common Safety Practices."

51. Explaining exactly how Bruce had allegedly violated these policies, the notice also stated, "On February 6, 2018 we became aware that you Chris Bruce Failed to Follow Work Orders or Procedures, you made unauthorized statements to the media, Telemundo. You had no prior authorization from the General Manager to do so." Hence defendants believe their "Making Unauthorized Statements to the Media" policy bans *any* statement that WRTA bus drivers make to the media, not just those made while somehow "representing CMTM and WRTA."

52. The notice of suspension also stated that, after CMTM and the WRTA began investigating Plaintiff Bruce because he had spoken to the news media, CMTM and the WRTA uncovered unspecified safety violations that Bruce allegedly had committed. On information and belief, these "safety violations" consisted of Bruce talking to a reporter while driving an empty, out-of-service bus slowly around the Hub lot.

53. On information and belief, it is not the usual practice of defendants to suspend bus drivers for safety violations on the basis that they talked to people on their bus.

54. The purportedly non-speech-related allegations contained in the notice of suspension (that Bruce failed to follow work orders or violated safety rules) are actually based on the fact that Bruce spoke to the news media and that his speech aired in a news segment that defendants did not like.

55. In addition, defendants bear animus against Bruce because of his history of pro-union associative conduct and speech. Throughout his time as a union leader, Bruce has appealed to the press and to government bodies to intercede on behalf of the union.

56. Hence the non-speech-related allegations in the February 7 notice of suspension are pretext, intended to cover up the real, speech-related reasons for suspending Bruce.

57. On about February 13, 2018, Defendant James Parker fired Plaintiff Christopher Bruce by letter. Defendant Parker's letter alleged that Bruce had committed unspecified "Class II infractions."

58. These unspecified "Class II infractions" are in fact the same infractions Bruce was accused of in the February 7 notice of suspension.

59. Defendant Parker's letter also banned Bruce from all WRTA property, with limited exceptions related to his role as a union officer. The letter's ban is so broad that it prohibits Bruce from riding WRTA public transportation as a private citizen.

60. On information and belief, defendants do not typically ban discharged employees from all WRTA property as they did with Plaintiff Bruce.

61. About February 20, 2018, Plaintiff ATU sent a letter to Defendants demanding Bruce's reinstatement on First Amendment grounds.

62. About March 12, 2018, after receiving Platiniff ATU's demand letter, Defendants suspended the other bus driver who had appeared in the news segment, David Tello.

## Count I
### Section 1983: Deprivation of Rights under the First Amendment

63. By permitting some uniformed employees to distribute pamphlets about state funding of public transit on Hub property, and failing to inform employees as a whole as to any limit on the right of employees to speak about state funding while in uniform on Hub property, the defendants created a public forum for the discussion of that topic. Defendants then unlawfully barred Bruce from that public forum because defendants did not like who he was (a union leader who had spoken to the media in the past) and the viewpoint of the Telemundo news segment (which cast the union in a positive light).

64. In addition and in the alternative, defendants retaliated against Bruce for his speech as a private citizen on a matter of public concern, and for his history of engaging in such speech.

65. Defendants' ban on Bruce entering WRTA property at all—even as a private citizen—evinces defendants' unlawful animus against his exercise of his First Amendment rights.

66. By those acts and the acts set forth throughout this complaint, the defendants violated the rights of Plaintiff Christopher Bruce under the First Amendment.

67. Unless restrained by this Court, the defendants will refuse to employ Bruce as a WRTA bus driver and will continue to ban Bruce from WRTA property.

WHEREFORE Plaintiffs Bruce and ATU pray this Court to:

A. Declare that by the acts set forth in this complaint, and in violation of 42 U.S.C. § 1983, defendants have acted under color of law to deprive Bruce of his First Amendment rights.

B. Enjoin defendants from (1) maintaining the facially invalid policy that prohibits WRTA bus drivers from speaking to the news media "without authorization," (2) using Bruce's February 6, 2018 exercise of First Amendment rights against him in any future action under the contractual progressive disciplinary policy, and (3) continuing to ban Bruce from WRTA property.

C. Order defendants to reinstate Bruce to his former position with no loss of seniority or other rights he enjoys under the CBA.

D. Grant compensatory damages to Bruce for the deprivation of his First Amendment rights.

E. Grant plaintiffs their legal fees and costs and such other relief as may be appropriate.

## Count II
## Massachusetts Civil Rights Act

68. By virtue of the collective bargaining agreement (CBA) between CMTM and ATU Local 22, WRTA bus drivers including Plaintiff Bruce are not at-will employees. Rather they are subject to discipline and discharge only for cause.

69. WRTA bus drivers thus have a property interest in their continued employment.

70. When the defendants issue a suspension or written warning to an employee, they habitually include an explicit threat that future action of the same kind by the employee will lead to more severe discipline, up to and including termination of that employee's employment.

71. The February 7 notice of suspension given to Bruce included such a threat.

72. Therefore defendants, by suspending Bruce, threatened, coerced, or intimidated him not to continue exercising his rights to freedom of speech under the First Amendment of the United States Constitution and Article XVI of the Massachusetts Constitution.

73. In addition and in the alternative, by maintaining, distributing, and enforcing the policy that for-cause employees who "Mak[e] Unauthorized Statements to the Media" will be subject to suspension and termination, the defendants continue to threaten, coerce, or intimidate all their employees to prevent them exercising their rights to freedom of speech under the First Amendment of the United States Constitution and Article XVI of the Massachusetts Constitution.

74. In addition and in the alternative, by terminating only ATU Local 22's president (i.e. Plaintiff Bruce) for "Making Unauthorized Statements to the Media," the defendants intended to, and did, make an example of him—a warning to employees of what will happen if they speak to the media on matters of public importance. The defendnats thereby threatened, coerced, or intimidated all other members of ATU Local 22 to prevent them exercising their rights to freedom of speech under the First Amendment of the United States Constitution and Article XVI of the Massachusetts Constitution.

75. By those acts and the acts set forth throughout this complaint, defendants interfered with the exercise and enjoyment of rights under the First Amendment of the United

States Constitution and Article XVI of the Massachusetts Constitution as to Bruce, the members of ATU Local 22, and all for-cause employees subject to the "Making Unauthorized Statements to the Media" policy.

76. By so doing, the defendants violated the Massachusetts Civil Rights Act, M.G.L. ch. 12, § 11I.

WHEREFORE plaintiffs pray this Court to:

A. Declare that by the acts set forth in this complaint, and in violation of M.G.L. ch 12, § 11I, defendants have interfered with ATU members' exercise and enjoyment of their rights guaranteed by First Amendment of the United States Constitution and Article XVI of the Massachusetts Constitution.

B. Enjoin defendants from (1) maintaining, distributing, and enforcing the policy that threatens WRTA bus drivers with suspension and termination for speaking to the news media "without authorization," (2) maintaining adverse disciplinary records against Bruce based on his February 6, 2018 exercise of First Amendment and Article XVI rights, and (3) continuing to ban Bruce from WRTA property.

C. Order defendants to reinstate Bruce to his former position with no loss of seniority or other rights he enjoys under the CBA.

D. Grant compensatory damages to Plaintiff Bruce for the deprivation of his First Amendment and Article XVI rights.

E. Grant plaintiffs their legal fees and costs and such other relief as may be appropriate.

## Count III
### Tortious Interference with Employment Relationship

77. In addition and in the alternative, Defendants Trabucco and Parker intentionally caused the termination of Plaintiff Bruce's employment relationship with CMTM and the WRTA.

78. By causing the firing of Plaintiff Bruce for making public statements that actually advanced the WRTA's and CMTM's goal of obtaining more funding for transit in Worcester, Defendants Trabucco and Parker acted with a spiteful, malignant purpose unrelated to any legitimate interest of CMTM or the WRTA.

79. By so doing, and by the acts set forth throughout this Complaint, Defendants Trabucco and Parker tortiously interfered with Plaintiff Bruce's employment relationship.

WHEREFORE plaintiffs pray this Court to:

A. Order defendants to reinstate Bruce to his former position with no loss of seniority or other rights he enjoys under the CBA.

B. Grant compensatory and punitive damages to Plaintiff Bruce.

C. Grant plaintiffs their legal fees and costs and such other relief as may be appropriate.

### Jury Demand

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a jury on all issues so triable.

Dated: March 26, 2018                              Respectfully submitted,

                 /s/*Harold Lichten*
               Harold L. Lichten (BBO #549689)
               Adelaide Pagano (BBO # 690518)
               Lichten & Liss-Riordan, P.C.
               729 Boylston St, Suite 2000
               Boston, MA 02116
               hlichten@llrlaw.com
               apagano@llrlaw.com
               (617) 994-5800

               Thomas H. Geoghegan
               Michael P. Persoon
               Michael A. Schorsch
               Despres, Schwartz & Geoghegan, Ltd.
               77 West Washington Street, Suite 711
               Chicago, Illinois 60602
               (312) 372-2511
               *To appear pro hac vice*