# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| _____ )<br>CHRISTOPHER BRUCE and, )<br>AMALGAMATED TRANSIT UNION, )<br>              **Plaintiffs,** )<br>             )<br>        **v.** )<br>             )<br>             )<br>             )<br>**WORCESTER REGIONAL TRANSIT AUTHORITY,** )<br>**CENTRAL MASS TRANSIT MANAGEMENT, INC.,** )<br>**DAVID TRABUCCO, JAMES PARKER and** )<br>**JONATHAN CHURCH,** )<br>           **Defendants.** )<br>_____ ) | **CIV. ACT. NO. 18-40037-TSH** |

## Memorandum of Decision and Order
### March 16, 2021

**Hillman, D.J.**

## Background

Plaintiffs, Christopher Bruce ("Bruce") and Amalgamated Transit Union[1], filed this action against the Worcester Regional Transport Authority ("WRTA"), Central Mass Transit Management, Inc. ("CMTM"), David Trabucco ("Trabucco"), James Parker ("Parker"), and Jonathan Church ("Church" and together with, WRTA, CMTM, Trabucco, Parker and Church, the "Defendants") as the result of Bruce's termination from his position as a bus driver. Bruce has asserted claims against all Defendants under 42 U.S.C. § 1983 (Count I) and the Massachusetts Civil Rights Act, Mass.Gen.L. ch. 12, § 11I ("MCRA")(Count II) for violation of

---

[1] Amalgamated Transit Union voluntarily dismissed its action. *See* Docket No. 80.

his right to free speech. Bruce has also asserted a state law claim against Trabucco and Parker for tortious interference with employment relations (Count III). This Memorandum of Decision and Order addresses the parties' cross-motions for summary judgment (Docket Nos. 86 and 89). For the reasons set forth below, summary judgment shall enter for the Defendants on all claims.[2]

## Standard of Review

Summary Judgment is appropriate where, "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Carroll v. Xerox Corp.*, 294 F.3d 231, 236 (1st Cir. 2002) (citing Fed. R. Civ. P. 56(c)). "'A "genuine" issue is one that could be resolved in favor of either party, and a "material fact" is one that has the potential of affecting the outcome of the case." *Sensing v. Outback Steakhouse of Florida, LLC*, 575 F.3d 145, 152 (1st Cir. 2009) (quoting *Calero-Cerezo v. U.S. Dep't. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004)).

When considering a motion for summary judgment, the Court construes the record in the light most favorable to the nonmoving party and makes all reasonable inferences in favor thereof. *Sensing,* 575 F.3d at 153. The moving party bears the burden to demonstrate the absence of a genuine issue of material fact within the record. *Id.,* at 152. "'Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party must come forward with facts that show a genuine issue for trial.'" *Id.* (citation to quoted case omitted). "'[T]he nonmoving party "may not rest upon mere allegations or denials of the [movant's] pleading, but must set forth specific facts showing that there is a

---

[2] The Court has jurisdiction over this case under 28 U.S.C. §§ 1331 and 1443 (plaintiff has asserted claims under federal law). Because of the posture of this case, *i.e.*, discovery has been completed and dispositive motions filed, the Court has exercised supplemental jurisdiction over Plaintiff's state law claims.

genuine issue of material fact as to each issue upon which [s/he] would bear the ultimate burden of proof at trial." *Id.* (citation to quoted case omitted).  The nonmoving party cannot rely on "conclusory allegations" or "improbable inferences". *Id.*  (citation to quoted case omitted). "'The test is whether, as to each essential element, there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." ' " *Id.* (citation to quoted case omitted).  "Cross-motions for summary judgment require the district court to 'consider each motion separately, drawing all inferences in favor of each non-moving party in turn.' " *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014)(citation to quoted case omitted).

## Facts

### The WRTA, CMTM and the CBA

The WRTA is a regional transit authority established by Mass.Gen.L. ch. 161B. By statute, the WRTA is expressly prohibited from "directly operat[ing] any mass transportation service" and, therefore engages contractors to operate its transit system.  CMTM is a private corporation which is party to a contract with WRTA[3] pursuant to which it is responsible for the day-to-day operations of the Worcester regional transit system. Under the contract, CMTM exercises full control over all personnel decisions, including discipline, hiring, and firing. In connection with that authority, CMTM has adopted and enforces its own employment and disciplinary rules and policies.  WRTA owns the buses and sets, approves and maintains control of the routes. WRTA also owns the property located at 60 Foster Street, Worcester, Massachusetts (the "Hub")  and the Maintenance and Operations Facility, located at 42 Quinsigamond Avenue, Worcester, Massachusetts (the "Maintenance and Operations Facility").

---

[3] CMTM is a wholly owned subsidiary of First Transit, Inc.  ("First Transit") which is the actual signatory to the contract.

During the relevant period, Parker was the General Manager of CMTM. However, he often signed correspondence identifying himself as General Manager of WRTA and also identified himself as such to other WRTA employees. Similarly, Trabucco signed his emails as an employee of WRTA.  Bus drivers such as Bruce are employees of CMTM and receive their W-2 Forms and paychecks from CMTM.  The uniforms for CMTM drivers have the WRTA logo, which is required by the CBA, which was negotiated by Amalgamated Transit Union Local #22 ("ATU Local 22"), which had a uniform committee of which Bruce was a member. The CBA requires all operators to wear the proper uniform: "When reporting for duty, Operators shall wear the proper uniform consisting of white shirts with WRTA logo ... Black cloth vests with WRTA logo … ."  Buses driven by CMTM operators have the WRTA logo on them, under which logo it reads: "operated by CMTM." WRTA directly pays the nonwage compensation of the drivers, including pensions benefits, which are paid directly out of the WRTA budget, and has secondary liability for wages.  CMTM receives guidance from WRTA as to the monetary impact of its contract with ATU Local 22.[4]

Bruce was hired as a Worcester bus driver in 1976 by the entity which was the predecessor to the WRTA. From 1994 to 2013, he was a full-time business agent for ATU Local 22. In 2013 Bruce  gave up his full-time position as ATU Local 22's  business agent and was replaced by Ken Kephart, ("Kephart") who continues to hold the position. Bruce became the ATU Local 22 president, an unpaid, elected position and went back to driving a bus.[5]  On July 13, 2015, CMTM and ATU Local 22 entered into a Collective Bargaining Agreement for the

---

[4] Massachusetts law prohibits private contractors from binding a transit authority to any long-term benefit to the drivers without  its approval.
[5] Prior to Bruce giving up the business agent position, Kephart had been serving as president of the ATU Local 22. Bruce and Kephart agreed to switch positions—upon Bruce's being elected as ATU Local 22 president, Kephart would become the full-time business agent and Bruce would return to being a bus driver.

period from July 1, 2015 to July 1, 2018 (the "CBA"), which Bruce was involved in negotiating,

and which outlines the relationship between CMTM and WRTA.

CMTM Safety Policies and Procedures

The CMTM Operator Handbook outlines the written safety practices that must be

adhered to in order to be a driver for CMTM.

Section 5.19 of the CMTM Operator Handbook provides, in part, as follows:

> . . . Operators are to refrain from unnecessary conversation with
> passengers while engaged in the duties of driving a bus. . .

> . . . The operator **must not proceed** until passengers are seated . . .
> Passengers should not be allowed to stand near the operator's seat
> merely to converse with the operator ...  (emphasis in original).

Section 6.29 of the CMTM Operator Handbook provides, in part, as follows:

> An operator must not permit anything to divert his/her attention
> from the safe and proper performance of his duty.
>
>          ….
>
> Holding unnecessary conversation, looking backward ... etc.,
> while the bus is in motion are all prohibited. Passengers should
> not be allowed to stand near yellow line [directly behind the
> driver] and converse with the driver.

Bruce was trained in safety and is familiar with the CMTM Operator Handbook. He

was responsible for training new employees at CMTM in safety.

CMTM has an Employee Discipline Policy which includes a list of Class II infractions.

Class II infractions do not result in immediate discharge, instead such an infraction results in a

10-15 day suspension for a first violation and discharge after the second. Class II infractions

include: making unauthorized statements to the media ( newspaper, TV, radio, etc.), that is

statements made as an employee of CMTM or WRTA without having obtained prior approval of

the General Manager.

<u>Bruce's Employment as a Bus Driver and the Events Leading to His Termination</u>

*<u>Bruce's Prior Disciplinary Record and the LC Agreement</u>*

During his employment by CMTM and the WRTA, Bruce had a significant disciplinary record. Within the three (3) years immediately preceding his final discharge, which is the subject of this action, he was terminated twice-- on August 31, 2015 and again on February 15, 2017-- for violating CMTM's Employee Discipline Policy (both terminations were rescinded by agreement). On June 1, 2016 he was demoted as the result of another violation.  After Bruce was terminated on February 15, 2017,  CMTM, Bruce, and ATU Local 22 entered into a Last Chance Return to Work Agreement (the "LC Agreement") dated March 30, 2017.  Both Bruce and Kephart (who was the union representative who signed the agreement for ATU Local 22), as business agents and leaders of ATU Local 22, had substantial experience dealing with  such last chance return to work agreements.  The WRTA is not a party to the LC Agreement.

In the LC Agreement, which was to remain in effect for two years, Bruce and ATU Local 22 agreed that any Class I or Class II violation of Employee Discipline Policy/Code of Conduct by Bruce would "result in immediate termination." They further agreed "to waive any and all rights they may have presently or in the future to file or assert any claim, complaint, grievance, appeal to arbitration or other action in any forum of any kind in regard to any further disciplinary action including termination invoked by the Company pursuant [thereto]." More specifically, the LC Agreement contains the following relevant provisions:

**[ ] Termination Settlement**.

(a) The Company agrees to reduce Mr. Bruce's termination from employment to a suspension without pay for the period February 15, 2017 through the date he returns to work pursuant to this Agreement. The date Mr. Bruce will return to work is Saturday, April 1, 2017.

(b) . . . Any determination by the Company of a Class I or Class II violation by

Mr. Bruce of the then existing Employee Discipline Policy/Code of Conduct, or violation of a Company Policy, Agreement or MOU which carries as a penalty for a first or second offense immediate discharge, or any infraction under the Company's anti-harassment/discrimination policy during this two-year period will result in immediate termination of Mr. Bruce's employment with the Company, and the Union and Mr. Bruce agree, as part of this Agreement, to waive the notice and hearing requirements under sections II A and B of the Collective Bargaining Agreement. The Union and Mr. Bruce further agree to waive any and all rights they may have presently or in the future to file or assert any claim, complaint, grievance, appeal to arbitration or other action in any forum of any kind in regard to any further disciplinary action including termination invoked by the Company pursuant to this Agreement for the two (2) year period.

....

4.**Representation**. Mr. Bruce and the Union acknowledge that Mr. Bruce has been given the opportunity to consult with a representative of his choosing prior to signing this Agreement, including consultation with the Union, and that he has done so.

....

7. **Voluntary Execution**. Mr. Bruce and the Union acknowledge that they have thoroughly read this Agreement, they understand it, and they are entering into it voluntarily.

Less than a year after entering the LC Agreement, Bruce was investigated for potentially committing a Class I and/or Class II infraction of the CMTM Employee Discipline Policy as the result of an alleged preventable accident which occurred on or about January 10, 2018. On February 2, 2018, Bruce received a final written warning from CMTM after it was determined that he did not conclusively violate a safety procedure or practice.

*Bruce's Final Termination*

In January 2018,  the Governor of Massachusetts proposed significant budget cuts in transportation spending for the 2019 Fiscal Year. Parker in his "CMTM Daily Info Blast Monday January 29, 2018," which he addressed to CMTM/WRTA employees, outlined the "dire financial straits" that CMTM/WRTA found itself in as the result of the ongoing failure of the Governor and the state legislature to support public transit.  Parker warned that should funding not be increased in the coming year, weekend bus service could be eliminated and jobs lost. Parker

implored employees to "contact your reps and feel free to talk with passengers, family, friends and each other [and] get the word out" to government officials. Parker envisioned that bus drivers would talk to passengers as they were entering or exiting the bus, that is, when the bus was halted.

After the proposed cuts were announced, Kephart and others (not including Bruce) approached Parker indicating that they wanted to do something about it. As their interests were aligned on this issue, CMTM worked with the ATU Local 22 Funding Committee, which was formed by members of ATU Local 22 who wanted to speak out about the budget cuts. Parker and Kephart agreed that CMTM employees could speak out about the proposed budgetary cuts, including while on CMTM premises and in uniform, provided they were off duty and not impacting operations in any way. CMTM did not want to give the public the impression that employees were being paid to speak out against the budget cuts which potentially impacted its operations, or to disrupt working hours.

On February 5, 2018, Bruce received a telephone call from an individual who identified herself as a reporter for Telemundo. She requested an interview with Bruce who told her to meet him the following day at 12:30 p.m. when he expected a shift change to be taking place. When Bruce was employed by ATU Local 22 as its business agent, he often spoke with the press about funding issues without the need of getting any prior approval from WRTA or CMTM.  After he left that position and became president (an unpaid position which he held while working full time as a WRTA bus driver), the press continued to contact him. Bruce did not call Parker for approval to give an interview to Telemundo. He assumed that as a member of the ATU Local 22

Funding Committee he had such prior approval because Parker and other CMTM/WRTA supervisors had extolled them to speak with family members and passengers.[6]

Bruce had originally planned for the interview to be at 12:30 p.m. on February 6, 2018, when his shift as the Report[7] would be over and he would not be driving. However, at approximately 11:00 a.m. the Telemundo Crew was already in place and rather than send them away, he and other drivers answered their questions. Bruce, while on duty and in uniform gave an interview to the Telemundo news crew while driving a WRTA bus around the Hub. Bruce thought that would be in the "spirit" of what they were trying to accomplish (obtaining additional funding). During the ride, a Telemundo cameraman was positioned forward of the yellow line (passengers are not permitted forward of the yellow line), with a television camera set up in the stairwell and partially obstructing his view through the bus windshield and door windows. While giving the interview, Bruce, who estimates he was driving around five miles per hour, repeatedly took his eyes off the road, looked directly into the camera, looked at the reporter, and engaged in conversation with her. At one point, Bruce took both hands off the wheel while the bus was in motion. Bruce acknowledged that if he took both hands off the wheel while the bus was in motion, it would constitute a violation of common safety practice, although he also stated that he

---

[6] Bruce testified at his deposition that he thought he had prior approval to speak because he was on the ATU Local 22 Funding Committee. However, according to his own statement of material facts he acknowledged at a February 8, 2018 meeting with Trabucco that he knew he should have asked Parker before giving the Telemundo interview, but as the former business agent he was used to not having to do so. Additionally, again according to Bruce's own statement of material facts, Parker had initially required all members of the ATU Local 22 Funding Committee to get prior approval from him to talk to the press unless off duty and out of uniform. Kephart, however, got Parker to agree that Funding Committee members could speak to the press while in uniform *so long as they were not working*.

[7] A bus driver referred to as the "Report" is supervised by the "Starter," who supervises the "Operators." The Report is responsible for taking buses to and from the Hub and the Maintenance and Operations Facility, as well as covering situations that might arise, such as a bus breaking down, an accident, or filling in for another driver needing to leave his shift requiring coverage.

did not think it would be a violation if he took his hands off the wheel for a second, or a half second.

At the time Bruce gave the interview, he had been instructed to bring a bus from the Maintenance and Operations Facility to the Hub to be placed into service and to return to the Maintenance and Operations Facility another bus located at the Hub that needed service. Instead of timely completing this assignment as directed, Bruce gave the interview described above. The Hub is the busiest location operated by CMTM for the WRTA and there are numerous vehicles and pedestrians moving within the area particularly in the middle of the day. These pedestrians frequently "j-walk" and walk into the roadways rather than staying on the sidewalks so that drivers are required to exercise extreme caution and the speed limit at the Hub is expressly limited to 5 mph and posted as such.

On February 7, 2018, Bruce was given written notice that he was being investigated for three Class II infractions: (1) the failure to follow work orders or procedures; (2) making unauthorized statements to the media; and (3) the willful or deliberate violation of or disregard of safety rules or common safety practices. Any one of these infractions was grounds for Bruce's termination under the LC Agreement. On February 8, 2018, after meeting with Trabucco and Jo-Ann Clougherty, Bruce and Kephart met with Parker.  On February 13, 2018, Bruce received his notice of termination. Thereafter, he requested to meet with Kephart and Parker, during which meeting Bruce admitted to all three (3) charges. He also apologized to Parker. During this meeting, Parker, on behalf of CMTM, never expressed that CMTM took issue with the content of Bruce's speech.

The WRTA was not provided with notice of and did not participate in the investigation of Bruce's conduct on February 6, 2018. The WRTA was not provided with any advance notice that

Bruce might be terminated and did not participate in or otherwise influence the decision to terminate Bruce. In fact, the WRTA was not even copied on the termination notice and did not learn of Bruce's termination until after it had occurred.  Bruce testified that he does not believe Trabucco has any animus toward him and did not believe Trabucco or Parker had any animus toward him in connection with the 2015 and 2016 disciplinary actions against him.

## **Discussion**

### Cross-Motions for Summary Judgment on Bruce's First Amendment Claims

Defendants seek summary judgment on the grounds that Bruce waived his right to bring this action under the LC Agreement.  CMTM further asserts that it is entitled to summary judgment on the merits of Bruce's civil rights claims against it. More specifically:  (a) Bruce's claims under Section 1983 fail because CMTM is a private entity; (b) Bruce cannot establish a First Amendment violation because regardless of the nature of the speech engaged in, he would have been terminated in any event for safety violations and failure to follow work orders under the terms of his LC Agreement; and (c) Bruce's MCRA act claim fails because CMTM did not threaten, intimidate, or coerce Bruce in connection with the challenged termination. The individual Defendants, Trabucco and Parker, seek summary judgment on the claim against them for Tortious Interference with Employment Relationship as he has failed to provide a scintilla of evidence that they acted with the requisite actual malice.

### *Whether Bruce's Claims are Barred by the LC Agreement*

Bruce has had a tortuous history with CMTM-- his termination in February 2018 was the fourth time in recent years that disciplinary action had been taken against him. On two prior occasions Bruce had been terminated (those terminations were rescinded by agreement) and on another, he was demoted.  Because of this prior history, at the time of the events which led to the

11

termination which is the subject of this action, Bruce was working under a so-called last chance employment agreement. By way of background, on February 15, 2017, Bruce was terminated by CMTM for dishonesty, harassment, insubordination, negligence in performance of duty and promoting or participating in a work stoppage or slow-down.[8]  CMTM, ATU Local 22 and Bruce negotiated an agreement whereby in return for his termination being rescinded, he was suspended forty-five (45) days without pay. The parties' agreement was memorialized in the LC Agreement which Bruce and ATU Local 22 signed on March 30, 2017. Bruce was represented by union counsel at the time he entered the LC Agreement which provided that if Bruce committed any Class I or Class II infractions constituting a violation of CMTM's Employee Discipline Policy/Code of Conduct during the proscribed two-year period, he would be subject to "immediate termination."  Bruce and ATU Local 22 further agreed, during that two year period, "to waive any and all rights they may have presently or in the future to file or assert any claim, complaint, grievance, appeal to arbitration or other action in any forum of any kind in regard to any further disciplinary action including termination invoked by the Company pursuant to this [LC] Agreement."

In mid-to-late January 2018, Bruce was investigated for a preventable accident which occurred on or about January 10, 2018; the accident potentially violated Class I and/or Class II of the CMTM Disciplinary Policy. On February 2, 2018, Bruce received a final written warning from CMTM after it was determined that he did not conclusively violate a safety procedure or practice (had it been concluded he had violated such procedure or practice it would have resulted in his termination pursuant to the LC Agreement).

---

[8] Bruce had agreed to take a colleague's shift, but then intentionally gave it back. His explanation to the colleague was "I have to f--- you to f--- the company."

On February 6, 2018, Bruce permitted a camera crew to interview him while he was driving a bus around the Hub, a business location frequented by pedestrians and other busses. Putting aside whether the subject of the interview constituted speech on a matter of public concern,  Bruce's decision to conduct that interview while on duty and driving a bus was a willful disregard of safety rules or common safety practice, and constituted a failure to follow work orders and procedures, either of which is a Class II Rule Infraction subjecting him to termination under the LC Agreement.  Moreover, by participating in the interview while in uniform, on duty, and driving the bus, Bruce committed a second Class II Rule Infraction: making an unauthorized statement to the media which was not pre-approved by the General Manager.

The First Circuit has recognized the validity of agreements, such as last chance agreements, containing waivers of an employee's right to pursue constitutional claims in consideration for resolving employment disputes so long as the employee's waiver was made knowingly and voluntarily. *See Rivera-Flores v. Bristol-Myers Squibb Caribbean*, 112 F.3d 9, 13 (1st Cir. 1997).   Bruce, however, argues that the LC Agreement's general waiver provision, which does not expressly state that he is waiving any statutory or constitutional rights, cannot be enforced in this case because he did not knowingly and voluntarily waive his right to challenge his termination on such grounds.

Waiver is an affirmative defense and therefore, the Defendants bear the burden to establish that Bruce's waiver was knowing and voluntary. In determining the validity of a waiver, the First Circuit has adopted a "totality of the circumstances" approach. In balancing the totality of the circumstances, the court considers a non-exclusive set of six factors: (1) plaintiff's education and business experience; (2) the respective roles of the employer and employee in the

determining the provisions of the waiver; (3) the clarity of the agreement; (4) the time plaintiff

had to study the agreement; (5) whether plaintiff had independent advice, such as that of counsel;

and (6) the consideration for the waiver. *Melanson v. Browning-Ferris Indus., Inc.*, 281 F.3d

272, 276 (1st Cir. 2002).

Bruce's assertion that he did not knowingly and voluntarily waive his rights to bring

these claims under the LC Agreement is dubious. He had union representation when he signed

the agreement, had adequate time to review it, had business savvy, *i.e.*, was not uneducated (he

had been a business agent for ATU Local 22 for about nineteen years and later served as

president), the agreement is clear and unambiguous, and there was consideration for his signing

it (in exchange for him signing the LC Agreement, CMTM rescinded his termination).  The only

factor in Bruce's favor is that CMTM drafted the waiver provision.   Nevertheless, I agree with

him that the fact that the waiver provision does not expressly specify that the waiver includes

constitutional and/or statutory claims at least brings its scope into question. Accordingly, on this

record, there is a genuine issue of material fact as to whether Bruce knowingly and voluntarily

waived his right so assert claims against the Defendants for violation of his right to free speech

under federal and state law and therefore, Defendants' motion for summary judgment is denied

on this ground.

<u>Whether Bruce was Terminated for Engaging in Protected Speech</u>

Bruce is seeking to hold the Defendants liable, pursuant to Section 1983 and the MCRA,

for violation of his right to engage in free speech. Specifically, Bruce argues that the Defendants

terminated him for speaking out on a matter of public interest, *i.e.*, employee and service cuts

which would result if the Governor of Massachusetts and state legislature failed to increase

funding for public transportation.  To establish a claim under Section 1983, Bruce must establish

14

that a person acting under the color of law denied her a right secured by the constitution or by federal law.  The MCRA is the state "counterpart" to Section 1983 and, in general, is coextensive therewith.  There are two primary differences: (1) the offensive conduct need not be attributable to a state actor; and (2) to succeed on an MCRA claim, a plaintiff must also show that the violation of rights occurred "by threats, intimidation or coercion." *Bally v. Northeastern Univ.,* 403 Mass. 713, 532 N.E.2d 49, 52 (1989); *see also* Mass. Gen. L. ch. 12, § 11I.

CMTM argues that because it is a private entity, Bruce's Section 1983 claim fails as a matter of law. Bruce argues that CMTM and the WRTA, as state actor, are so "pervasively intertwined" that his termination can be fairly attributable to state action. Because I find that Bruce's Section 1983 claim fails on other grounds, I will assume for purposes of this discussion that CMTM was acting under color of state law when it terminated him[9].

I start with two bedrock principles. First, "[a] government employee does not surrender all of [his] First Amendment rights at [his] employer's doorstep, and has the right to speak as a citizen addressing matters of public concern" *Davignon v. Hodgson,* 524 F.3d 91, 100 (1st Cir. 2008)(citing *Garcetti v. Ceballos*, 547 U.S. 410, 417, 126 S.Ct. 1951 (2006) and *City of San Diego v. Roe*, 543 U.S. 77, 80, 125 S.Ct. 521 (2004)). At the same time, "a government employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public." *City of San Diego*, 543 U.S. at 80, 125 S.Ct. 521.  Applying these principles, a public employee's speech is protected where (1)  he speaks as a citizen, (2) on a matter of public concern.  If the employee satisfies both elements, then his interest in speaking out must be balanced against the public employer's interest in promoting the efficiency of public services it performs through its employees. *Decotiis v. Whittmore*, 635 F.3d

---

[9] Because I am assuming that CMTM was a public entity, for ease of reference during this discussion and elsewhere in this opinion, I have refereed to CMTM/WRTA as the common employer.

22, 29-30 (1st Cir. 2011). Both determinations are made by the court as a matter of law. *Foley v. Randolph,* 601 F.Supp.2d 379, 384 (D.Mass. 2009)  Where the balancing favors the employee,  it "must then be determined whether the protected speech was a 'substantial or motivating factor in the adverse action' against the [employee]'" *Davignon*, 524 F.3d at 100.  Thus, to prevail on his claim, Bruce must establish that he was terminated in retaliation for exercising his right to free speech by showing (1) that he engaged in protected speech which resulted in an adverse employment action against him, and (2) his protected speech was the substantial motivating factor behind the adverse employment action. *See Stuart v. City of Framingham*, No. 20-1135, 11 (1st Cir. Feb. 24, 2021). If the employee meets this burden, then to escape liability the public employer must establish by a preponderance of the evidence, that it would have taken the adverse employment action regardless. *Id.* "[T]he plaintiff may then discredit the proffered nondiscriminatory reason, either circumstantially or directly, by adducing evidence that discrimination was more likely than not a motivating factor." *Id.* at 11-12 (citation to quoted case and internal quotation marks omitted)*.*

Defendants acknowledge that Bruce was speaking out on a matter of public concern-- the level of funding of the WRTA which could affect employee jobs and the level of service provided-- but argue that he did so in his capacity as a bus driver and not a citizen. In determining whether Bruce was speaking in his capacity as an employee of CMTM or a citizen, the Court looks to whether the alleged speech was made within the scope of his employment duties, not whether it concerns his employment.  To make this determination, the court considers the following factors: (i) whether the employee was paid to make the speech in question; (ii) the subject matter of the speech; (iii) whether the speech was made up the chain of command; (iv) whether the employee spoke at his place of employment; (v) whether objective observers would

16

have the impression that the employee was speaking on behalf of his employer; (vi) whether the content of the speech derived from special knowledge the employee obtained during the course of his employment; and (vii) whether there is a so-called citizen analogue to the employee's speech. *See Amirault v. City of Malden*, 241 F.Supp.3d 288, 300 (D.Mass. 2017)(*citing Decotiis*, 635 F.3d at 32).

In this case, Bruce was not paid for the Telemundo interview; he spoke on matters related to his employment, *i.e.*, the amount of funding the Governor and state legislature proposed for public transportation in the upcoming fiscal year and how that would affect job and the level of service. Parker, the general manager of CMTM, encouraged bus drivers to discuss the funding issue with family and customers. However, CMTM and WRTA employees while on duty were required to get permission before talking to the press on work related issues--  Bruce did not do so. Instead, Bruce chose to participate in the interview with Telemundo while on duty, dressed in uniform and driving a bus on CMTM/WRTA property— a reasonable person would identify Bruce as a CMTM/WRTA employee, not a private citizen.  While the amount of public funds which CMTM/WRTA was slated to receive in the upcoming fiscal year was a matter of public knowledge, how the funding would affect CMTM employees and the level of service is information learned by Bruce during his employment—that is, the subject matter of the speech was directly related to his professional responsibilities.  Moreover, Bruce acknowledges that because of his former role as the ATU Local 22 business agent, the press often contacted him to comment on matters concerning CMTM/WRTA because it was part of his job duties. Finally, Bruce's ability to speak on this topic when he did, arose because of position as a bus driver, it was not a situation in which any citizen could speak (Telemundo could have approached private citizens while at the HUB and asked them about potential service cuts. However, Bruce was

approached by Telemundo because of his position as a bus driver and the interview was conducted while he was driving a bus—an opportunity which would not be available to an everyday citizen).  Considering the totality of the circumstances, Bruce's own allegations establish that when he conducted his interview with Telemundo he did so as an employee of CMTM and not a private citizen. Therefore, he did not engage in protected speech.[10]

Even if the Court were to assume that Bruce engaged in protected speech which outweighed CMTM's interest, his claim would fail. Bruce has a history of disciplinary conduct which led to him being terminated on two prior occasions with both terminations being rescinded after negotiations between ATU Local 22 and CMTM. On the second occasion, in exchange for not being terminated, he entered into the LC Agreement which unambiguously stated that he would be terminated if he committed any further Class I or Class II violations under the Employee Discipline Policy/Code of Conduct. When agreeing to talk to Telemundo Bruno could have insisted that the interview take place while he was off-duty, or at least when he was not driving a bus. Instead, Bruce chose to conduct an interview with Telemundo while on- duty driving a bus around the Hub, an active business location where pedestrians and other busses were frequently on the move. The uncontroverted evidence establishes that Bruce was not terminated for speaking out to Telemundo on a public issue, *i.e.*, proposed budget cuts, but for committing three serious Class II infractions: willful disregard of safety rules and/or common safety practice while driving a bus, failing to follow work orders and procedures, and giving an unauthorized interview to the press. Put another way, Bruce was terminated for permitting

---

[10] Assuming that Bruce was a citizen speaking on a matter of public concern, the Court would then have to balance the interest of CMTM, for purposes of this discussion a public employer, in promoting the efficiency of public services.  Bruce's speech can be said to have created disharmony in the workplace— not because of its content, but because he gave the interview without getting permission from Parker in direct contravention of CMTM's express policies and procedures. Also, the way he conducted it impaired his ability to carry out his duties. However, given my prior findings, I need not resolve the issue of whether  CMTM's interests outweigh Bruce's interest in commenting on matters of public concern.

Telemundo to interview him while he was on duty driving a bus, not because he gave the interview, or for anything he said in the interview.

Bruce has failed to discredit the Defendants' proffered non-discriminatory reason for terminating him. On the contrary, he has acknowledged committing the Class II infractions, any one of which subjected him to termination under the LC Agreement. Indeed, Kephart specifically negotiated with Parker to permit ATU Local 22 Funding Committee members to speak with the press while on CMTM/WRTA property, while in uniform, without prior authorization from him *so long as they were not on duty.* Bruce, a member of the Funding Committee, spoke with Telemundo while on CMTM/WRTA property and on duty without obtaining the requisite permission.  Any argument by Bruce that his speech was more likely than not the motivating factor behind his termination is further undermined by the fact that the Defendants not only agreed with the substance of his speech but, as previously noted, they encouraged personnel to discuss the need for increased funding of public transportation with their family and customers.

As to Bruce's MCRA claim, for the same reasons that his Section 1983 claim fails, I find that his equivalent state law claim fails. For the reasons set forth above, Defendants are entitled to summary judgment on Bruce's First Amendment claims.

<u>Plaintiff's Tortious Interference Claims Against the Individual Defendants</u>

Trabucco and Parker assert that they are entitled to summary  judgment on Bruce's claim for tortious interference because he failed to plead or otherwise establish that the acted with the requisite actual malice. Bruce did not address Defendants' arguments regarding this claim in  his opposition. For that reason and for the reasons stated in Defendants' supporting memoranda, summary judgment shall enter for Defendants on this claim.

**<u>Conclusion</u>**

1. Defendants' Joint Motion for Summary Judgment (Docket No. 86) is ***granted***; and

2. Plaintiff's Motion for Summary Judgment (Docket No. 89) is ***denied***.


**So Ordered:**

/**s**/ *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**