# United States Court of Appeals
## For the First Circuit

Nos. 21-1293, 21-1300

CHRISTOPHER BRUCE,

Plaintiff, Appellant, Cross-Appellee,

AMALGAMATED TRANSIT UNION,

Plaintiff,

v.

WORCESTER REGIONAL TRANSIT AUTHORITY; CENTRAL MASS TRANSIT
MANAGEMENT, INC.; DAVID TRABUCCO, in his individual and official
capacities; JONATHAN CHURCH, in his individual and official
capacities,

Defendants, Appellees, Cross-Appellants,

JAMES PARKER, in his individual and official capacities,

Defendant, Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Barron, Chief Judge,
Howard and Thompson, Circuit Judges.

Willem Bloom, with whom Michael P. Persoon, Thomas H.
Geoghegan, Despres, Schwartz & Geoghegan, Ltd., Harold Lichten,
and Lichten & Liss-Riordan, P.C. were on brief, for appellant/
cross-appellee.

Thomas J. Conte, with whom Alexandra N. Mansfield and Mirick, O'Connell, DeMallie & Lougee, LLP were on brief, for appellees/ cross-appellants.

Christopher B. Kaczmarek and Littler Mendelson, P.C. on brief for appellee James Parker.

_____

May 18, 2022

_____

BARRON, **Chief Judge**.  Christopher Bruce is a former bus driver for the Worcester Regional Transit Authority ("WRTA").  He was employed in that capacity by Central Mass Transit Management, Inc. ("CMTM"), which had contracted with WRTA to provide bus service to the City of Worcester and surrounding towns.  While so employed, Bruce also served as president of the bus drivers' union, Amalgamated Transit Union Local 22 ("Local 22").  Bruce was fired on February 8, 2018, from his job as a WRTA bus driver.  His termination followed the public comments that he made to a television network about proposed budget cuts to the WRTA.

In response to the termination of his employment, Bruce filed suit under 42 U.S.C. § 1983 claiming a violation of his right to free speech under the First Amendment of the U.S. Constitution and under the Massachusetts Civil Rights Act ("MCRA") in the United States District Court for the District of Massachusetts.  He named as defendants WRTA; CMTM; James Parker, the general manager of CMTM; David Trabucco, the director of operations of CMTM; and Jonathan Church, the Executive Director of WRTA.  The District Court granted summary judgment to the defendants on Bruce's claims. We vacate and remand.

**I.**

WRTA is a Massachusetts public authority that provides transit service to Worcester and surrounding towns.  See Mass. Gen. Laws ch. 161B, §§ 2, 3.  WRTA is prohibited from "directly

operat[ing] any mass transportation service," id. § 25, however, and so it contracts with a private party to operate that service, see id. § 6(f).

During the time relevant to the issues in this appeal, WRTA contracted with CMTM, which is a wholly owned subsidiary of First Transit, Inc.  WRTA's bus drivers are employees of CMTM but nonetheless wear uniforms with WRTA logos, and WRTA pays the drivers' nonwage compensation, such as pension benefits, directly out of its own budget.  WRTA also owns the buses that the drivers operate, approves bus routes, makes certain service-related decisions, and owns real property where the drivers perform some of their duties, including the site known as "the Hub."  Finally, some officers of CMTM -- including Parker and Trabucco -- often identify themselves as officers of WRTA when they send correspondence.

At the same time, CMTM has adopted its own rules for employment, including for disciplining its employees, and CMTM enforces those rules.  CMTM also negotiates with Local 22.

Bruce worked as a WRTA bus driver from 1976 until 1994, when he left to work as a full-time business agent for Local 22. Bruce then returned to work at WRTA, as a CMTM employee, in 2013 when he was elected president of Local 22, which is an unpaid role.

In 2015, CMTM terminated Bruce's employment for disciplinary infractions, including improper cell phone use while

- 4 -

driving and failure to follow orders. That termination was later rescinded by agreement. But, after another disciplinary infraction, Bruce was demoted in 2016 and eventually terminated from employment with CMTM in February 2017 after "giving back" an overtime shift for which he had previously volunteered.

Following this latter termination, Bruce approached the Local 22 business agent, Ken Kephart, and told him that he "wanted to get back to work as soon as possible." Bruce asked Kephart "to go in and talk to [CMTM] to see if he could make an arrangement to make a last chance or a way to get back."

Bruce was apparently referring to what is known as a "last chance agreement." Kephart indicated that he did not like last chance agreements, and so did Bruce. But, Bruce said, "I need to get back to work."

Bruce, Kephart, and Parker entered into a last chance agreement on March 30, 2017 (the "Last Chance Agreement"). The Last Chance Agreement provided that Bruce's termination of employment would be converted to a suspension without pay for the period that he was not working and that Bruce would return to work on April 1, 2017. It further provided that "[a]ny determination by" CMTM that Bruce had committed certain disciplinary infractions during a two-year period would "result in immediate termination of Mr. Bruce's employment."

In addition, under the agreement, Bruce and Kephart agreed "to waive any and all rights they may have presently or in the future to file or assert any claim, complaint, grievance, appeal to arbitration or other action in any forum of any kind in regard to any further disciplinary action including termination invoked by [CMTM] pursuant to [the Last Chance] Agreement for the two (2) year period." Bruce also was given under the agreement "the opportunity to consult with a representative of his choosing prior to signing this Agreement, including consultation with [Bruce's] Union," and the agreement stated that Bruce "has done so."

Bruce faced discipline again in January 2018, when he was investigated for leaving the scene of an accident. It was determined, however, that he did not conclusively violate a safety procedure or practice.

That same month, the Governor of Massachusetts proposed significant budget cuts to regional transportation authorities in his proposed budget for the 2019 fiscal year. CMTM and Local 22 agreed to participate in joint efforts to oppose the budget cuts.

On January 29, 2018, Parker included in his daily email to CMTM employees a message that directed CMTM drivers to "contact your reps and feel free to talk with passengers, family, friends and each other." Trabucco and Church testified that no preapproval was needed for employees who spoke to the media while off-duty and

- 6 -

not in uniform, but the written policy covered "[a]ll statements in which an employee is representing CMTM or WRTA" without reference to hours of duty or uniform.

Bruce participated in an interview regarding the budget cuts with the Worcester Telegram & Gazette for an article that the newspaper published on February 4, 2018.  Bruce was working at the time as a "report" driver.  He thus was responsible at the time both for driving WRTA buses that had been taken out of service from the "Hub," which is the central terminal for WRTA services, to CMTM's maintenance and operations facility, for filling in for sick drivers, and for driving repaired buses back from that facility to the "Hub" so that the buses could be placed back in service.

The newspaper article discussed Local 22's efforts to "mobiliz[e] in the face of rumored service cuts and job losses as [WRTA] confronts an anticipated $1 million budget shortfall."  The article reported that "Bruce, [the] Local 22 president, said he hadn't seen an effort like this since the strike of 2004."  Bruce testified that he was on duty when he gave the interview.

The next day, February 5, 2018, Bruce received a telephone call from a reporter for the local Telemundo television station.  The reporter requested to interview bus drivers about the proposed budget cuts, and Bruce told her to meet him the next day at 12:30 PM at the Hub, when there would be a shift change.

Bruce contacted four other drivers to arrange for them to speak with the reporter too. Bruce arrived at the Hub at 11:00 AM after bringing a bus there, and the Telemundo TV crew had already arrived.

Bruce spoke with the crew, one member of whom asked to take a ride in a bus around the Hub to prepare the camera. Bruce did not check in with his immediate supervisor to determine if he had any tasks to perform. However, Bruce testified that he knew he did not because all of the buses at the repair garage were in disrepair, so his next job would have to be to take a bus back from the Hub.

Bruce gave an interview to the TV crew before his shift ended while in uniform and driving a bus around the back lot at the Hub at no more than 5 miles per hour with no one else on board. A short clip from Bruce's interview aired that night on Telemundo.

The clip shows Bruce briefly looking at the reporter, who stood behind him, and at one point taking both hands off of the steering wheel. Bruce tells the interviewer that if the proposed budgets cuts are enacted, "the public will be the loser." A chyron identifies Bruce as "Presidente del Sindicato," meaning "President of the Union."

The following day, February 7, Bruce received a letter from David Trabucco, CMTM director of operations, that informed him that he was being investigated for making unauthorized

statements to the media, for a willful or deliberate violation of or disregard of safety rules or common safety practice, and for a failure to follow work orders.  CMTM policy requires drivers to seek preapproval for "[a]ll statements in which an employee is representing CMTM or WRTA."

Trabucco met with Bruce on February 8.  Kephart and Jo-Ann Clougherty, the Human Resources Manager for CMTM, attended the meeting as well.

Clougherty's notes of the meeting reflect that Bruce said that he had "no intention of doing anything bad.  I screwed up . . . [g]ot phone calls from media should have had them call Ken [Parker]."  The notes further state that Trabucco informed Bruce "You know you need authorization to speak," and Bruce responded, "yes I know."  Trabucco informed Bruce that he would be taken out of service pending the investigation.

Bruce and Kephart subsequently met with Parker.  Bruce testified that he said the same thing to Parker that he had said to Trabucco.

Parker wrote a letter to Bruce on February 13 informing him that he had been terminated following "the investigation of the . . . infractions you were charged with."

Bruce and Kephart subsequently went to see Parker the same day to ask him to reconsider the termination.  Parker, in a memorandum for record written after that conversation, wrote that

he "went through each of the three charges which led to my decision," and that "Chris acknowledged that he committed the offenses." Parker further wrote that he "explained that [he] felt the coordination of an unauthorized media interview combined with the completely unsafe manner in which it was conducted while he was on the clock and should have been driving the bus back to the garage led to my decision. I felt he was doing this to thumb his nose at the company and if I let it pass it would establish a dangerous precedent." Parker testified that the memorandum accurately reflected the conversation.

Bruce and Amalgamated Transit Union filed suit against WRTA, CMTM, Trabucco, Church, and Parker on March 26, 2018. After discovery, both plaintiffs and defendants filed cross-motions for summary judgment. The District Court denied the plaintiffs' motion and granted the defendants' motion. See Bruce v. Worcester Reg'l Transit Auth., 527 F. Supp. 3d 67, 81 (D. Mass. 2021).

Bruce timely appealed; he was not joined by the Amalgamated Transit Union. All of the defendants except Parker cross-appealed based on the District Court's conclusion that the waiver that Bruce had signed in the Last Chance Agreement did not bar his claims. Although the District Court had merely "assume[d] . . . that CMTM was acting under color of state law when it terminated" Bruce, id. at 78, the appealing defendants also

appealed "to the extent that the [District] Court found that CMTM
was so entwined with WRTA that it constituted a state actor."

**II.**

We begin with Bruce's challenge to the District Court's
grant of summary judgment to the defendants on his § 1983 claim.
Bruce alleges in that claim that he was fired based on his
interview with Telemundo in violation of the First Amendment.

"To determine whether an adverse employment action
against a public employee violated an individual's First Amendment
free speech rights, we employ a three-part inquiry." Gilbert v.
City of Chicopee, 915 F.3d 74, 82 (1st Cir. 2019); see also
Curran v. Cousins, 509 F.3d 36, 45 (1st Cir. 2007) (aligning this
circuit's three-part test with Garcetti v. Ceballos, 547 U.S. 410
(2006)). The first part concerns whether the public employee
"spoke as a citizen on a matter of public concern." Gilbert, 915
F.3d at 82 (quoting Curran, 509 F.3d at 45). The second part
concerns whether, if the employee did so, "the relevant government
entity had an adequate justification for treating the employee
differently from any other member of the general public." Curran,
509 F.3d at 45 (quoting Garcetti, 547 U.S. at 418). The third
part concerns whether, if that government entity did not have an
adequate justification, "the protected expression was a
substantial or motivating factor in the adverse employment
decision." Id. Even then, "the employer must have the opportunity

to prove that it would have made the same decision regardless of the protected expression." Id. (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)); see also McCue v. Bradstreet, 807 F.3d 334, 338-39 (1st Cir. 2015).

Bruce contends that the defendants are not entitled to summary judgment on this claim because of what he contends the record shows in relation to each part of the tripartite constitutional inquiry.  We review the District Court's decision de novo to determine if a "reasonable fact-finder, examining the evidence and drawing all reasonable inferences helpful to [Bruce] could resolve the dispute in [Bruce's] favor." Hill v. Walsh, 884 F.3d 16, 21 (1st Cir. 2018) (citations omitted).

## A.

There is no dispute that the budget cuts that Bruce discussed in his interview with Telemundo constituted a "matter of public concern." Curran, 509 F.3d at 45.  The parties do dispute, however, whether Bruce "spoke as a citizen," id., or, instead, only "pursuant to [his] official duties," Decotiis v. Whittemore, 635 F.3d 22, 30 (1st Cir. 2011) (quoting Garcetti, 547 U.S. at 421).  Bruce contends that, given what a reasonable juror could find the record shows about the circumstances in which he was speaking during the interview, he was speaking as a citizen. Insofar as there is no material dispute of fact with respect to the circumstances in which Bruce gave the interview, the question

- 12 -

of whether Bruce is right on that score is one of law. <u>Curran</u>, 509 F.3d at 45 (citing <u>Connick</u> v. <u>Myers</u>, 461 U.S. 138, 148 n.7 (1983)).

To assess Bruce's contention, it helps to start by reviewing what the Supreme Court of the United States held in <u>Garcetti</u>, as that case, too, concerned a public employee's First Amendment challenge to a termination of his employer that he contended was based on speech that he made at work. There, a deputy district attorney alleged that his supervisors violated the First Amendment when they retaliated against him for speech that he made to them concerning what he saw as deficiencies in a pending prosecution by his office. 547 U.S. at 413-15. The Supreme Court held that the District Court had correctly granted summary judgment to the defendants, because the prosecutor's "expressions were made pursuant to his duties as a calendar deputy," given that he "spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case." <u>Id.</u> at 421.

The Supreme Court stated the general rule this way: "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." <u>Id.</u> The Supreme Court made clear, however, that it was "not dispositive" that the

prosecutor had "expressed his views inside the office, rather than publicly," because "[e]mployees in some cases may receive First Amendment protection for expressions made at work."  Id. at 420 (citing Givhan v. W. Line Consol. Sch. Dist., 439 U.S. 410, 414 (1979)).

Thus, when determining whether an employee spoke "pursuant to their official duties," we must focus on whether the speech was "part of what" the employee was "employed to do" rather than merely whether the employee engaged in the speech "at work." Id. at 420, 421. As the Court has put it following Garcetti: "The critical question under Garcetti is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." See Lane v. Franks, 573 U.S. 228, 240 (2014).

Here, there is no question that Bruce spoke to Telemundo while he was "at work."  But, Bruce contends, the District Court erred in ruling that he spoke to Telemundo during the interview pursuant to his official duties and not "as a citizen."  And that is because, he argues, he was speaking to Telemundo as an official of Local 22 about a matter that merely concerned his duties in a general sense.

Bruce urges that we hold that a public employee is not speaking pursuant to his official duties -- and is instead speaking in his capacity as a citizen -- whenever the employee is speaking,

even at work, as an official of the employee's union. Bruce argues that such a rule is supported by Supreme Court precedent that "draw[s] a clear distinction between employer speech and union speech." See Janus v. Am. Fed. Of St., Cty., and Mun. Emps., 138 S. Ct. 2448, 2474 (2018) (noting that unions "speak[] for the employees, not the employer"). And, Bruce further contends that some of our sister circuits have adopted this rule. See Boulton v. Swanson, 795 F.3d 526, 534 (6th Cir. 2015) ("We . . . hold that speech in connection with union activities is speech 'as a citizen' for purposes of the First Amendment."); Ellins v. City of Sierra Madre, 710 F.3d 1049, 1059-60 (9th Cir. 2013) (same); Fuerst v. Clarke, 454 F.3d 770, 774 (7th Cir. 2006) ("Because [an employee's] comments that precipitated the adverse action taken against him were made in his capacity as a union representative, rather than in the course of his employment as a deputy sheriff . . . [Garcetti] is inapposite.").

We need not go that far. Under our post-Garcetti precedent in this area, it is evident that, given what a reasonable juror could find about the circumstances in which Bruce was speaking to Telemundo, Bruce was speaking in his capacity "as a citizen" during the interview.

In applying Garcetti, we have identified a number of nonexclusive factors that indicate that a public employee is speaking "as a citizen," rather than "pursuant to the [employee's]

official duties." They include "whether the employee was commissioned or paid to make the speech in question" by the employer; whether "the subject matter of the speech" indicates the capacity in which the employee was speaking; "whether the speech was made up the chain of command" of the employer or independent of it; "whether the employee spoke at her place of employment" or elsewhere; "whether the speech gave objective observers the impression that the employee represented the employer when she spoke (lending it 'official significance')"; "whether the employee's speech derived from special knowledge obtained during the course of her employment"; and "whether there is a so-called citizen analogue to the speech." Gilbert, 915 F.3d at 82 (quoting Decotiis, 635 F.3d at 32).

Bruce contends that, in light of what the record supportably shows with respect to each of those factors it was error for the District Court to conclude that, as a matter of law, he was not speaking "as a citizen" during the Telemundo interview. We agree.

A reasonable juror could find on this record -- as the parties appear to agree -- that Bruce was not paid by CMTM to speak with Telemundo, and that Telemundo identified Bruce to its viewers as "Presidente del Sindicato" (or, "President of the Union"). Such a juror also could find on this record that Bruce's speech did not derive from any special knowledge that he had gained as a

public employee but was based instead on the common-sense premise (or, at most, a premise that he could have learned as a union official) that cuts to WRTA's budget would impact WRTA service.

Moreover, a reasonable juror could find on this record that Bruce's statements to Telemundo were essentially the same as ones that a typical WRTA rider could have made, which would support the determination that there is a citizen analogue to the speech at issue. Nor, obviously, were Bruce's comments made up the chain of command. In fact, that a reasonable juror could find that Bruce spoke -- as the defendants' own position accepts -- to Telemundo contrary to his employer's directives indicates that his speech fell outside his professional duties. See Dahlia v. Rodriguez, 735 F.3d 1060, 1075 (9th Cir. 2013) (en banc).

The defendants stress in response that the record shows that Bruce was interviewed in uniform, while driving a bus on WRTA property in the middle of his workday. But, the same could be said of any speech by Bruce while he was in uniform at work. Garcetti is clear in holding that there is a distinction between speech made "pursuant to [an employee's] official duties" and speech made "at work." 547 U.S. at 420, 421; see also id. at 420 ("That Ceballos expressed his views inside his office, rather than publicly, is not dispositive.").

The defendants do argue that "[w]hile Bruce's 'official duties' may not have included making public addresses, it is

undisputed that CMTM authorized its employees to speak out
regarding the WRTA budget cuts, including by handing out flyers."
And it is true that the fact that the employer commissions or pays
for the speech at issue points in favor of the determination that
the speech was not made "as a citizen."  It does not follow,
however, that the employer's failure to prohibit that speech
necessarily means that the speech is made "pursuant to official
duties." Cf. Decotiis, 635 F.3d at 31 ("In identifying Plaintiff's
official responsibilities, 'the proper inquiry is "practical"
rather than formal, focusing on "the duties an employee actually
is expected to perform,"' and not merely those formally listed in
the employee's job description." (quoting Mercado-Berrios v.
Cancel-Alegría, 611 F.3d 18, 26 (1st Cir. 2010))).

          The defendants also point to a statement by Bruce in his
motion for summary judgment below that suggests that Telemundo
sought out drivers to interview generally, rather than union
representatives.  There is no dispute, though, that Telemundo
identified Bruce as the union president, rather than as a driver,
in the clip of the interview shown to the public.  Moreover, given
the strength of the factors that point towards a conclusion that
Bruce was speaking in a private capacity, the fact that Telemundo
may have been seeking comments from WRTA drivers in their role as
drivers does not suffice to show that, as a matter of law on this
record, Bruce himself was speaking to Telemundo during the

interview in that capacity rather than in his capacity as a union president.

## B.

We come, then, to the second part of the three-part inquiry. Here, the question is whether, even if Bruce spoke "as a citizen" on a "matter of public concern" during the Telemundo interview, the defendants "had an adequate justification for treating [him] differently from any other member of the general public" by terminating him for his protected speech, Curran, 509 F.3d at 45 (quoting Garcetti, 547 U.S. at 418).

The defendants urge us to affirm the District Court's grant of summary judgment to them on Bruce's § 1983 claim on this ground, notwithstanding that the District Court made no finding regarding it. We decline to do so.

This portion of the inquiry requires that we "attempt[] to 'balance the value of an employee's speech -- both the employee's own interests and the public's interest in the information the employee seeks to impart -- against the employer's legitimate government interest in preventing unnecessary disruptions and inefficiencies in carrying out its public service mission.'" Decotiis, 635 F.3d at 35 (internal quotation marks omitted) (quoting Guilloty Perez v. Pierluisi, 339 F.3d 43, 52 (1st Cir. 2003)); see also Connick, 461 U.S. at 140; Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, 391 U.S. 563, 568 (1968).

We consider "(1) 'the time, place, and manner of the employee's speech,' and (2) 'the employer's motivation in making the adverse employment decision.'" Decotiis, 635 F.3d at 35 (quoting Davignon v. Hodgson, 524 F.3d 91, 104 (1st Cir. 2008)). If, in considering these factors, we determine that the employee "face[d] only those speech restrictions that are necessary for [his] employer[] to operate efficiently and effectively," Garcetti, 547 U.S. at 419, then the defendants' restrictions on speech were adequately justified and we must affirm the District Court's grant of summary judgment to the defendants. The resolution of this question is, like the question we have just discussed, a matter of law for the court to decide. Curran, 509 F.3d at 45.

        The determination of whether the firing of a public employee for violating a restriction on speech that the employer imposed is justified necessarily hinges on the nature of that restriction. Bruce contends that the record suffices to allow a reasonable juror to find that the speech restriction at issue was the one in CMTM's Employee Discipline Policy, which, as we have mentioned, provides that "[a]ll statements in which an employee is representing CMTM or WRTA must be pre-approved by the General Manager." The defendants contend that even if he was terminated because of that policy, that policy was adequately justified by the defendants' efficiency and safety interests.

That policy, by its plain language, covers even statements made while an employee is off duty and without regard to their content. And while Parker testified that it did not reach that far, he was unable to point to anything that would substantiate his claim that the policy was not as broad as its plain language would suggest, creating at least a genuine issue of fact as to the reach of the policy. Thus, insofar as a juror could find that the policy is as broad as its terms indicate that it is, as we conclude such a juror could, we do not see how that policy is "necessary" for WRTA and CMTM "to operate efficiently and effectively," Garcetti, 547 U.S. at 419.

Notably, WRTA and CMTM do not offer any justification for requiring pre-authorization in the expansive array of scenarios where an employee might be said to be "representing" one of those organizations, particularly given that they applied the policy to an interview in which Bruce was identified as the union president. True, Parker does argue that "[a]n employer need not show an actual adverse effect in order to terminate an employee," Curran, 509 F.3d at 49, but instead may "consider . . . speech's potential to disrupt," Davignon, 524 F.3d at 105 (emphasis added). But, in Davignon, we did not allow a public employer to use the potential for speech to cause disruption as a post hoc rationalization for terminating an employee; we instead looked to

the record to determine whether the potential for disruption was actually the reason for the firing. Id.

Here, the record would allow a reasonable juror to conclude that Bruce was terminated simply because he violated the broad preauthorization policy and not because of any specific conduct in which he engaged for which a more tailored preauthorization policy might be warranted. And, that being so, his termination simply for violating that broad preauthorization policy cannot plausibly be justified as necessary to protect the defendants' legitimate safety and efficiency interests.

### C.

That brings us to the third part of the three-part inquiry, which concerns whether the public employee can "demonstrate 'that the protected expression was a substantial or motivating factor in the adverse employment decision.'" Delaney v. Town of Abington, 890 F.3d 1, 6 (1st Cir. 2018) (quoting Curran, 509 F.3d at 45). In holding that Bruce failed to make that showing, the District Court pointed -- and the defendants now point -- to the fact that the defendants consistently stated that Bruce committed three infractions, any of which subjected him to termination under the Last Chance Agreement. See Bruce, 527 F. Supp. 3d at 80. The defendants now renew their argument that because Bruce committed two terminable violations that did "not involv[e] speech of any kind," they are "not liable because Bruce

would have been terminated for either of the other two (2) listed infractions, which did not involve speech." Parker advances an argument along similar lines.

As Bruce explains, however, the memorandum from Parker contemporaneously recording the conversation that he had with Bruce and Kephart states that Bruce was fired because Parker "felt the coordination of an unauthorized media interview combined with the completely unsafe manner in which it was conducted while he was on the clock and should have been driving the bus back to the garage" (emphasis added), demonstrates that "the non-speech actions alone were not sufficient to justify termination" such that a reasonable juror could conclude that the speech element was the motivating factor for Parker's decision. Bruce also points to Parker's comment to Bruce that Parker felt Bruce was "thumb[ing] his nose at" CMTM and that Parker could not "let it pass," arguing that these statements demonstrate that Bruce's speech was central to his termination.

Thus, given this evidence, we agree with Bruce that a reasonable juror could read Parker's memorandum to say that the mere fact that Bruce gave an unauthorized interview was the substantial factor behind his termination, or that the three disciplinary violations are so intertwined that the resulting termination cannot be understood except as a reaction to Bruce's interview. We also agree with Bruce that a reasonable juror could

infer from the comment that Bruce was "thumb[ing] his nose" that
Parker perceived a personal affront from Bruce's comments that
must be based on Bruce's failure to seek preauthorization for his
interview, as that reasonable juror might think it odd for the
other violations to give rise to such a feeling.  Moreover, the
record does not contain any evidence that would compel a reasonable
juror to conclude that Bruce would have been terminated had he
engaged in the same conduct but not given an unauthorized
interview.  The defendants' arguments to the contrary identify, at
best, evidence that Bruce <u>could</u> have been terminated.

### D.

            Parker asserts, as a separate ground for affirming the
District Court's ruling, what is known as the <u>Mt. Healthy</u> defense
-- that the defendants "would have terminated Bruce's employment
regardless of his comments to Telemundo."  To the extent this
defense is separate from the "substantial or motivating factor"
inquiry, <u>see</u> <u>Decotiis</u>, 635 F.3d at 29-30 (directing us to look to
<u>Mt. Healthy</u> only if the aforementioned "three parts of the inquiry
are resolved in favor of the plaintiff"), our reasoning as to that
inquiry is equally on point.

            As we have explained, although a reasonable juror might
be compelled to conclude based on the record evidence that Bruce
<u>could</u> have been fired pursuant to the terms of the Last Chance
Agreement based on his conduct, such a juror would not be compelled

to conclude on this record that Bruce <u>would</u> have been fired. So, we cannot affirm the grant of summary judgment on this ground either.

### III.

We next turn to Bruce's MCRA claim. The District Court granted summary judgment to the defendants on this claim "for the same reasons" that it gave in granting them summary judgment on his § 1983 claim. <u>Bruce</u>, 527 F. Supp. 3d at 81. Thus, for the reasons we have discussed, we reverse the grant of summary judgment on this claim, too.

The defendants briefly argue, however, that we should affirm notwithstanding our treatment of the § 1983 claim because, before the District Court, the defendants advanced arguments that Bruce had not shown the requisite threats, intimidation, or coercion to succeed on a MCRA claim, <u>see</u> Mass. Gen. Laws ch. 12, §§ 11H(a)(1), 11I, and Bruce did not rebut these arguments. Because the District Court did not address this contention below, we leave it to be addressed by the District Court in the first instance on remand.

### IV.

There remains to address only the defendants' contentions -- which they style as a cross appeal -- that we may affirm the District Court's grant of summary judgment on the alternative grounds that (1) the Last Chance Agreement barred

Bruce's claims and (2) Bruce has failed to meet his burden to show "state action."  See Alberty-Vélez v. Corporación de P.R. Para La Difusion Publica, 361 F.3d 1, 5 n.4 (1st Cir. 2004) (noting that although "a party may not appeal from a favorable judgment," even when the District Court has rejected some of that party's arguments, we still may "treat [the] cross-appeal as a request that we affirm the summary judgment ruling on" the bases the District Court rejected).  As we will explain, we conclude that the ultimate resolution of whether each of these grounds has merit is also best addressed by the District Court in the first instance on remand.  See Yan v. ReWalk Robotics Ltd., 973 F.3d 22, 39 (1st Cir. 2020) (noting our "discretion" to choose this course).

**A.**

In the Last Chance Agreement, Bruce and Local 22 agreed "to waive any and all rights they may have presently or in the future to file or assert any claim, complaint, grievance, appeal to arbitration or other action in any forum of any kind in regard to any further disciplinary action including termination invoked by [CMTM] pursuant to [the Last Chance] Agreement for the two (2) year period."  "Waiver and release are affirmative defenses on which the employer bears the burden."  Rivera-Flores v. Bristol-Myers Squibb Caribbean, 112 F.3d 9, 12 (1st Cir. 1997) (citing Fed. R. Civ. P. 8(c)).  We review the District Court's conclusion

that the defendants did not meet that burden de novo.  Hill, 884
F.3d at 21.

     With respect to Bruce's § 1983 claim, the District Court
applied our precedent addressing the waiver of federal statutory
claims, which requires that such a waiver must have been made
knowingly and voluntarily.  See Rivera-Flores, 112 F.3d at 11, 12.
Under that precedent, we have applied a totality of the
circumstances test that includes, but is not limited to, "a non-
exclusive set of six factors," namely "(1) plaintiff's education
and business experience; (2) the respective roles of the employer
and employee in determining the provisions of the waiver; (3) the
clarity of the agreement; (4) the time plaintiff had to study the
agreement; (5) whether plaintiff had independent advice, such as
that of counsel; and (6) the consideration for the waiver."
Melanson v. Browning-Ferris Indus., Inc., 281 F.3d 272, 276 & n.4
(1st Cir. 2002) (citing Smart v. Gillette Co. Long-Term Disability
Plan, 70 F.3d 173, 181 n.3 (1st Cir. 1995)).

     The District Court ruled based on these factors that
"[t]he only factor in Bruce's favor is that CMTM drafted the waiver
provision," but the District Court nonetheless concluded "that the
fact that the waiver provision does not expressly specify that the
waiver includes constitutional and/or statutory claims at least
brings its scope into question."  Bruce, 527 F. Supp. 3d at 78.
The District Court thus found that there was "a genuine issue of

material fact as to whether Bruce knowingly and voluntarily waived his right [to] assert claims against the Defendants for violation of his right to free speech under federal . . . law." Id.

We have never held, however, that a "magic words" test is applicable to any type of claim, such that a waiver must expressly name the precise claims that it reaches to be knowing and voluntary. And so, to the extent that the District Court relied on the mere failure to mention such claims as the basis for ruling in Bruce's favor with respect to the waiver question, we agree with the defendants that the District Court erred.

Bruce argues, however, that, even if that is so, the Last Chance Agreement does not bar his § 1983 claim because he is seeking in it to vindicate a "fundamental constitutional right" -- specifically a First Amendment right. He thus argues both that there must be "clear and convincing evidence" that he knowingly and voluntarily waived his First Amendment-based claim and that, under that heightened evidentiary standard, it was impossible for him knowingly and voluntarily to waive his "unknown First Amendment claims" that had not yet arisen. See Janus, 138 S. Ct. at 2486 (establishing that "to be effective," a waiver of First Amendment rights "must be freely given and shown by 'clear and compelling' evidence" (quoting Curtis Publishing Co. v. Butts, 388 U.S. 130, 145 (1967) (plurality opinion))); Johnson v. Zerbst, 304 U.S. 458, 464 (1938) (directing us to "'indulge every reasonable presumption

against waiver' of fundamental constitutional rights" (quoting Aetna Ins. Co. v. Kennedy, 301 U.S. 389, 393 (1937))).

Bruce made the same argument below, but the District Court did not address it and instead ruled in his favor under our typical waiver standard. We thus leave it for the District Court to address in the first instance on remand. We note in this regard that the defendants do not identify any case -- nor are we aware of any -- in which we have permitted a waiver of a First Amendment claim brought under § 1983, and that the one precedent that the defendants do invoke is a district court opinion that, although it asserts that "[i]t is settled law in the First Circuit that agreements containing waivers of an employee's right to . . . pursue constitutional claims as consideration for resolving an employment dispute . . . are valid and enforceable where a defendant/employer establishes that the waiver was made knowingly and voluntarily," Higgins v. Town of Concord, 322 F. Supp. 3d 218, 225 (D. Mass. 2018), cites only to cases that do not involve constitutionally-based claims such as the one that Bruce brings, see id.

As for the MCRA claim, the question of when and how an employee may waive such claims in an employment agreement is a matter of state law, given that the rights MCRA protects are grounded in state law and contract interpretation is itself typically a matter of state law. See Ruiz-Sánchez v. Goodyear

Tire & Rubber Co., 717 F.3d 249, 252 (1st Cir. 2013);
Livingstone v. North Belle Vernon Borough, 91 F.3d 515, 539 (3d
Cir. 1996). The District Court relied, however, only on our
precedents concerning the waiver of federal statutory claims. See
Bruce, 527 F. Supp. 3d at 77-78. Thus, even if, as the defendants
contend, the District Court erred in applying that precedent to
find that the Last Chance Agreement did not constitute a knowing
and intelligent waiver of that claim, it erred by not applying the
state law requirements for effecting the waiver of such a claim.
Finding no definitive guidance from the SJC on the question, and
the defendants having failed to identify any on-point state court
precedent, here, too, we think the proper course is to permit the
District Court to address the parties' arguments in the first
instance.

**B.**

As a last ground for affirming the District Court, the
defendants contend that CMTM and its officers and employees are
not state actors, while the only state actor among the defendants
-- WRTA -- had no role in Bruce's termination. They thus contend
that Bruce's First Amendment-based § 1983 claim necessarily fails
and that in consequence, so, too, necessarily, does his MCRA claim.
But, here, too, we think the better course is for us to permit the
District Court to address that contention on remand, given that it
merely "assume[d] for purposes of [its] discussion" of Bruce's

termination that Bruce's "termination can be fairly attributable
to state action" and so has not addressed the state-action issue.
<u>Bruce</u>, 527 F. Supp. 3d at 78.[1]

## V.

We **<u>vacate</u>** the District Court's grant of summary judgment
to the defendants and **<u>remand</u>** for further proceedings consistent
with this opinion.  The parties shall bear their own costs.

---

[1] None of the defendants raised any immunities as a
defense to us or in their motions for summary judgment, and so we
do not address them.