**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**CHRISTOPHER BRUCE,**
**Plaintiff,**

**v.**

**WORCESTER REGIONAL TRANSIT AUTHORITY, and CENTRAL MASS TRANSIT MANAGEMENT, INC.,**
**Defendants.**

**CIV. ACT. NO. 18-40037-TSH**

**Memorandum of Decision and Order**
**February 8, 2023**

**Hillman, S.D.J.**

## Background

Plaintiff, Christopher Bruce ("Bruce") filed this action against the Worcester Regional Transport Authority ("WRTA"), and Central Mass Transit Management, Inc. ("CMTM" and together with, WRTA, the "Defendants") as the result of his termination from his position as a bus driver. Bruce has asserted claims against all Defendants under 42 U.S.C. § 1983 (Count I) and the Massachusetts Civil Rights Act, Mass.Gen.L. ch. 12, § 11I ("MCRA")(Count II) for violation of his right to free speech.[1] This Memorandum of Decision and Order addresses

[1] Bruce also asserted the aforementioned claims against David Trabucco ("Trabucco"), Operations Manager for CMTM, James Parker ("Parker"), General Manager of CMTM, and Jonathan Church ("Church"), Administrator of the WRTA, in their individual capacities as well as a state law claim for tortious interference against Trabucco and Parker. In ruling on the parties' cross-motions for summary judgment, this Court found in favor of all defendants on all claims. Bruce prevailed on his appeal of the Court's rulings regarding his Section 1983 and MCRA claims, but did not appeal the dismissal of the state law tortious interference claim against Trabucco and Parker. After the filing of the instant motion for summary judgment, Bruce voluntarily dismissed all remaining claims against Trabucco, Parker and Church.

Defendants' Second Joint Motion For Summary Judgment (Docket No. 120) and Plaintiff's Motion For Leave To Supplement Record (Docket No. 135). For the reasons set forth below, Defendants' motion for summary judgment is *granted* in part, and *denied*, in part, and Plaintiff's motion to supplement is *denied*.

**Standard of Review**

Summary Judgment is appropriate where, "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Carroll v. Xerox Corp*., 294 F.3d 231, 236 (1st Cir. 2002) (citing Fed. R. Civ. P. 56(c)). "'A "genuine" issue is one that could be resolved in favor of either party, and a "material fact" is one that has the potential of affecting the outcome of the case." *Sensing v. Outback Steakhouse of Florida, LLC*, 575 F.3d 145, 152 (1st Cir. 2009) (quoting *Calero-Cerezo v. U.S. Dep't. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004)).

When considering a motion for summary judgment, the Court construes the record in the light most favorable to the nonmoving party and makes all reasonable inferences in favor thereof. *Sensing,* 575 F.3d at 153. The moving party bears the burden to demonstrate the absence of a genuine issue of material fact within the record. *Id.,* at 152. "'Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party must come forward with facts that show a genuine issue for trial.'" *Id.* (citation to quoted case omitted). "'[T]he nonmoving party "may not rest upon mere allegations or denials of the [movant's] pleading but must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which [s/he] would bear the ultimate burden of proof at trial." *Id.* (citation to quoted case omitted). The nonmoving party cannot rely on

"conclusory allegations" or "improbable inferences". *Id.* (citation to quoted case omitted). "'The test is whether, as to each essential element, there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." ' " *Id.* (citation to quoted case omitted.

**Facts**[2]

The WRTA and CMTM

The WRTA is a regional transit authority established by Mass.Gen.L. ch. 161B. By statute, the WRTA is expressly prohibited from "directly operat[ing] any mass transportation service" and, therefore engages contractors to operate its transit system. CMTM is a private corporation which is party to a contract with WRTA[3] pursuant to which it is responsible for the day-to-day operations of the Worcester regional transit system. Under the contract, CMTM exercises full control over all personnel decisions, including discipline, hiring, and firing. In connection with that authority, CMTM has adopted and enforces its own employment and disciplinary rules and policies. WRTA owns the buses and sets, approves and maintains control of the routes. WRTA also owns the property located at 60 Foster Street, Worcester, Massachusetts (the "Hub") and the Maintenance and Operations Facility, located at 42 Quinsigamond Avenue, Worcester, Massachusetts (the "Maintenance and Operations Facility").

Bus drivers such as Bruce are employees of CMTM and receive their W-2 Forms and paychecks from CMTM. The uniforms for CMTM drivers have the WRTA logo, which is required by the collective bargaining agreement ("CBA"), which was negotiated by Amalgamated Transit Union Local #22 ("ATU Local 22") and CMTM, which had a uniform

---

[2] The Court previously made detailed factual findings regarding Bruce's claims in its Memorandum of Decision and Order, dated March 16, 2021 (Docket No. 106)("Prior Order"). For purposes of this Memorandum of Decision and Order, the Court has included only those factual findings relevant to Defendants' instant motion.

[3] CMTM is a wholly owned subsidiary of First Transit, Inc., which is the actual signatory to the contract.

committee of which Bruce was a member. The CBA requires all operators to wear the proper uniform: "When reporting for duty, Operators shall wear the proper uniform consisting of white shirts with WRTA logo ... Black cloth vests with WRTA logo … ." Buses driven by CMTM operators have the WRTA logo on them, under which logo it reads: "operated by CMTM." WRTA directly pays the nonwage compensation of the drivers, including pensions benefits, which are paid directly out of the WRTA budget, and has secondary liability for wages. CMTM receives guidance from WRTA as to the monetary impact of its contract with ATU Local 22.[4] On July 13, 2015, CMTM and ATU Local 22 entered into a CBA for the period from July 1, 2015 to July 1, 2018, which outlines the relationship between CMTM and WRTA.

Bruce's Employment as a Bus Driver and the Events Leading to His Termination

*Bruce's Prior Disciplinary Record and the LC Agreement*

During his employment by CMTM and the WRTA, Bruce had a significant disciplinary record. Within the three (3) years immediately preceding his final discharge, which is the subject of this action, he was terminated twice-- on August 31, 2015 and again on February 15, 2017-- for violating CMTM's Employee Discipline Policy (both terminations were rescinded by agreement). On June 1, 2016, he was demoted as the result of another violation. After Bruce was terminated on February 15, 2017, CMTM, Bruce, and ATU Local 22 entered into a Last Chance Return to Work Agreement (the "LC Agreement") dated March 30, 2017. Ken Kephart ("Kephart") who succeeded Bruce as ATU Local 22's business agent when Bruce resigned from the position in 2013,was the union representative who signed the LC Agreement for ATU Local 22. Both Bruce and Kephart had substantial experience dealing with such last chance return to work agreements. The WRTA is not a party to the LC Agreement.

[4] Massachusetts law prohibits private contractors from binding a transit authority to any long-term benefit to the drivers without its approval.

In the LC Agreement, which was to remain in effect for two years, Bruce and ATU Local 22 agreed that any Class I or Class II violation of Employee Discipline Policy/Code of Conduct by Bruce would "result in immediate termination." They further agreed "to waive any and all rights they may have presently or in the future to file or assert any claim, complaint, grievance, appeal to arbitration or other action in any forum of any kind in regard to any further disciplinary action including termination invoked by the Company pursuant [thereto]." More specifically, the LC Agreement contains the following relevant provisions:

> **[ ] Termination Settlement**.
>
> (a) The Company agrees to reduce Mr. Bruce's termination from employment to a suspension without pay for the period February 15, 2017 through the date he returns to work pursuant to this Agreement. The date Mr. Bruce will return to work is Saturday, April 1, 2017.
>
> (b) . . . Any determination by the Company of a Class I or Class II violation by Mr. Bruce of the then existing Employee Discipline Policy/Code of Conduct, or violation of a Company Policy, Agreement or MOU which carries as a penalty for a first or second offense immediate discharge, or any infraction under the Company's anti-harassment/discrimination policy during this two-year period will result in immediate termination of Mr. Bruce's employment with the Company, and the Union and Mr. Bruce agree, as part of this Agreement, to waive the notice and hearing requirements under sections II A and B of the Collective Bargaining Agreement. The Union and Mr. Bruce further agree to waive any and all rights they may have presently or in the future to file or assert any claim, complaint, grievance, appeal to arbitration or other action in any forum of any kind in regard to any further disciplinary action including termination invoked by the Company pursuant to this Agreement for the two (2) year period.
>
> ....
>
> 4.**Representation**. Mr. Bruce and the Union acknowledge that Mr. Bruce has been given the opportunity to consult with a representative of his choosing prior to signing this Agreement, including consultation with the Union, and that he has done so.
>
> ....

> 7. **Voluntary Execution**. Mr. Bruce and the Union acknowledge that they have thoroughly read this Agreement, they understand it, and they are entering into it voluntarily.

Less than a year after entering the LC Agreement, Bruce was investigated for potentially committing a Class I and/or Class II infraction of the CMTM Employee Discipline Policy as the result of an alleged preventable accident which occurred on or about January 10, 2018. On February 2, 2018, Bruce received a final written warning from CMTM after it was determined that he did not conclusively violate a safety procedure or practice.

*Bruce's Final Termination*

In January 2018, the Governor of Massachusetts proposed significant budget cuts in transportation spending for the 2019 Fiscal Year. Parker in his "CMTM Daily Info Blast Monday January 29, 2018," which he addressed to CMTM/WRTA employees, outlined the "dire financial straits" that CMTM/WRTA found itself in as the result of the ongoing failure of the Governor and the state legislature to support public transit. Parker warned that should funding not be increased in the coming year, weekend bus service could be eliminated, and jobs lost. Parker implored employees to "contact your reps and feel free to talk with passengers, family, friends and each other [and] get the word out" to government officials. Parker envisioned that bus drivers would talk to passengers as they were entering or exiting the bus, that is, when the bus was halted. Kephart and others (not including Bruce) approached Parker indicating that they wanted to do something regarding the proposed cuts. Consequently, Parker and Kephart agreed that CMTM employees could speak out about the proposed budgetary cuts, including while on CMTM premises and in uniform, provided they were off duty and not impacting operations in any way.

On February 5, 2018, Bruce received a telephone call from an individual who identified herself as a reporter for Telemundo. She requested an interview with Bruce who told her to meet

him the following day at 12:30 p.m. when he expected a shift change to be taking place. When the Telemundo crew arrived early the following day, Bruce decided, while on duty and in uniform, to permit the Telemundo news crew to interview him while he was driving a WRTA bus around the Hub. While giving the interview, Bruce repeatedly took his eyes off the road, looked directly into the camera, looked at the reporter, and engaged in conversation with her. At one point, Bruce took both hands off the wheel while the bus was in motion. Bruce acknowledged that if he took both hands off the wheel while the bus was in motion, it would constitute a violation of common safety practice, although he also stated that he did not think it would be a violation if he took his hands off the wheel for a second, or a half second. At the time Bruce gave the interview, he had been instructed to bring a bus from the Maintenance and Operations Facility to the Hub to be placed into service and to return to the Maintenance and Operations Facility another bus located at the Hub that needed service. Instead of timely completing this assignment as directed, Bruce participated in the interview with Telemundo.

On February 7, 2018, Bruce was given written notice that he was being investigated for three Class II infractions: (1) the failure to follow work orders or procedures; (2) making unauthorized statements to the media; and (3) the willful or deliberate violation of or disregard of safety rules or common safety practices. Any one of these infractions was grounds for Bruce's termination under the LC Agreement. On February 8, 2018, after meeting with Trabucco and Jo-Ann Clougherty, Bruce and Kephart met with Parker. On February 13, 2018, Bruce received his notice of termination. Thereafter, he requested to meet with Kephart and Parker, during which meeting Bruce admitted to all three (3) charges. He also apologized to Parker. During this meeting, Parker, on behalf of CMTM, never expressed that CMTM took issue with the content of Bruce's speech.

The WRTA was not provided with notice of and did not participate in the investigation of Bruce's conduct on February 6, 2018. The WRTA was not provided with any advance notice that Bruce might be terminated and did not participate in or otherwise influence the decision to terminate Bruce. In fact, the WRTA was not even copied on the termination notice and did not learn of Bruce's termination until after it had occurred.

**Discussion**

Defendants' Motion for Summary Judgment on Bruce's Section 1983 First Amendment Claim

Defendants seek summary judgment on Bruce's state and federal civil right claims against them the grounds that Bruce waived his right to bring this action under the LC Agreement. Defendants further asserts that Bruce's federal civil rights claim against CMTM fails because it is not a state actor for purposes of Section 1983 and Bruce's MCRA act claim fails because Bruce was not threatened, intimidated, or coerced Bruce in connection with his challenged termination.

Whether Bruce's Claims are Barred by the LC Agreement

As noted in the Court's Prior Order, Bruce has a tortuous history with CMTM-- his termination in February 2018 was the fourth time in recent years that disciplinary action had been taken against him. On two prior occasions Bruce had been terminated (those terminations were rescinded by agreement) and on another, he was demoted. Because of this prior history, at the time of the events which led to the termination which is the subject of this action, Bruce was working under a so-called last chance employment agreement (the LC Agreement). By way of background, on February 15, 2017, Bruce was terminated by CMTM for dishonesty, harassment, insubordination, negligence in performance of duty and promoting or participating in a work

stoppage or slow-down.[5] CMTM, ATU Local 22 and Bruce negotiated the LC Agreement whereby in return for his termination being rescinded, he was suspended forty-five (45) days without pay. Bruce and ATU Local 22 signed the LC Agreement on March 30, 2017. Bruce was represented by union counsel at the time he entered the LC Agreement, which provided that if Bruce committed any Class I or Class II infractions constituting a violation of CMTM's Employee Discipline Policy/Code of Conduct during the proscribed two-year period, he would be subject to "immediate termination." Bruce and ATU Local 22 further agreed, during that two-year period, "to waive any and all rights they may have presently or in the future to file or assert any claim, complaint, grievance, appeal to arbitration or other action in any forum of any kind in regard to any further disciplinary action including termination invoked by the Company pursuant to this [LC] Agreement."

In mid-to-late January 2018, Bruce was investigated for a preventable accident which occurred on or about January 10, 2018; the accident potentially violated Class I and/or Class II of the CMTM Disciplinary Policy. On February 2, 2018, Bruce received a final written warning from CMTM after it was determined that he did not conclusively violate a safety procedure or practice (had it been concluded he had violated such procedure or practice it would have resulted in his termination pursuant to the LC Agreement). On February 6, 2018, Bruce permitted a camera crew to interview him while he was driving a bus around the Hub, a business location frequented by pedestrians and other busses. CMTM took the position that Bruce's decision to conduct that interview while on duty and driving a bus was a willful disregard of safety rules or common safety practice and constituted a failure to follow work orders and procedures, either of which is a Class II Rule Infraction subjecting him to termination under the LC Agreement.

[5] Bruce had agreed to take a colleague's shift, but then intentionally gave it back. His explanation to the colleague was "I have to f--- you to f--- the company."

Moreover, by participating in the interview while in uniform, on duty, and driving the bus, Bruce committed a second-Class II Rule Infraction: making an unauthorized statement to the media which was not pre-approved by the General Manager. Accordingly, CMTM terminated Bruce's employment.

Bruce contends that he was speaking on a matter of public concern and could not be terminated for doing so (the First Circuit agreed) and contends that his termination therefore violated his First Amendment Rights. Bruce further argues that the LC Agreement's general waiver provision, which does not expressly state that he is waiving any statutory or constitutional rights, cannot be enforced in this case because he did not knowingly and voluntarily waive his right to challenge his termination on such grounds. The Defendants, on the other hand, contend that Bruce was terminated for committing safety infractions and not for speaking out on matters of public concern and in any event, under the terms of the LC Agreement, he waived his right to assert any and all claims regarding his termination, including claims for violation of his constitutional rights.[6] It is the latter point that is at issue here.

The First Circuit has recognized the validity of agreements, such as last chance agreements, containing waivers of an employee's right to pursue constitutional claims in consideration for resolving employment disputes so long as the employee's waiver was made knowingly and voluntarily. *See Rivera-Flores v. Bristol-Myers Squibb Caribbean*, 112 F.3d 9, 13 (1st Cir. 1997). In determining the validity of a waiver, the First Circuit has adopted a "totality of the circumstances" approach. In balancing the totality of the circumstances, the court considers a non-exclusive set of six factors: (1) plaintiff's education and business experience; (2) the

[6]It is uncontested that Bruce was terminated during the two-year period during which the waiver provision applied.

respective roles of the employer and employee in the determining the provisions of the waiver; (3) the clarity of the agreement; (4) the time plaintiff had to study the agreement; (5) whether plaintiff had independent advice, such as that of counsel; and (6) the consideration for the waiver. *Melanson v. Browning-Ferris Indus., Inc.*, 281 F.3d 272, 276 (1st Cir. 2002). Waiver is an affirmative defense and therefore, the Defendants bear the burden to establish that Bruce's waiver was knowing and voluntary.

In applying these factors, the Court has considered that Bruce had union representation when he signed the agreement, had adequate time to review it, had business savvy, *i.e.*, was not uneducated (he had been a business agent for ATU Local 22 for about nineteen years and later served as president), the agreement is clear and unambiguous, and there was consideration for his signing it (in exchange for him signing the LC Agreement, CMTM rescinded his termination). At the same time, a strong factor in Bruce's favor is that CMTM drafted the waiver provision. Although it is a close call, I agree with Bruce that the fact that the waiver provision does not expressly specify that the waiver includes constitutional and/or statutory claims at least brings its scope into question. Accordingly, on this record, there is a genuine issue of material fact as to whether Bruce knowingly and voluntarily waived his right so assert claims against the Defendants for violation of his right to free speech under federal and state law and therefore, Defendants' motion for summary judgment is denied on this ground.[7]

[7] As noted by Defendants, on the face of his answers to interrogatories, Bruce seemingly admits that he knowingly waived all his rights under the LC, including his right to bring constitutional claims. Bruce has filed a motion to supplement the record to amend his answer, suggesting that his admittance was the result of a typographical error. Bruce's motion is *denied* as I find that rather than "supplementing" the record, he is attempting to amend his answer—at this late stage of the proceedings, he has failed to establish good cause to do so. Even considering Bruce's admission, I have found that there exists a question of fact regarding the waiver. At trial, Defendants will be permitted to enter the admission into evidence subject to the normal rules of direct and cross examination.

Whether CMTM is a State Actor For Purposes of Section 1983

To establish a claim under Section 1983, Bruce must establish that a person acting under the color of law denied him a right secured by the constitution or by federal law. CMTM asserts that it is a private entity not subject to suit under Section 1983 and therefore, is entitled to summary judgment on this claim, as a matter of law. *See Santiago v. Puerto Rico*, 655 F.3d 61, 68 (1st Cir. 2011)(if private entity's conduct cannot be classified as state action, Section 1983 claims against it fail). Bruce argues that under governing law, CMTM can be deemed a state actor subject to suit under Section 1983.

"The bar for [establishing a private entity is a state actor] is set quite high, and [the First Circuit has] cautioned that '[i]t is '[o]nly in rare circumstances' that private parties can be viewed as state actors.'" This inquiry is typically factbound." *Jarvis v. Vill. Gun Shop, Inc.,* 805 F.3d 1, 8 (1st Cir. 2015)(internal citations and citation to quoted case omitted).

There are three circumstances under which a private entity may be deemed a public actor:

> A private party may become a state actor if [it] assumes a traditional public function when performing the challenged conduct; or if the challenged conduct is coerced or significantly encouraged by the state; or if the state has 'so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in [the challenged activity].' If the facts, viewed most hospitably to the plaintiff, make out a jury question as to any one of these alternatives—the public function test, the state compulsion test, or the nexus/joint action test—the 'under color of state law' requirement is satisfied for summary judgment purposes.

*Santiago v. Puerto Rico*, 655 F.3d 61, 68–69 (1st Cir. 2011)(internal citations and citation to quoted cause omitted)(all but first alteration in original). Bruce's contention that CMTM is a state actor under the public function test is specious.[8] Therefore, the Court will focus on Bruce's

[8] Provision of transportation, such as public bus routes, has not been exclusively "within the purview of the state" because it has traditionally also been undertaken by private entities. *See Santiago*, 655 F.3d at 69. Therefore, CMTM cannot be said to assume a traditionally public function as a result of its contract to operate public bus

arguments that CMTM is a state actor under either the second test, *i.e.*, the so-called "state compulsion test" whereby the decision to terminate him must have compelled or heavily influenced by state regulation, or the third test, *i.e.*, the joint action/intertwinement test whereby the ties between the WRTA and CMTM are sufficiently close such that CMTM's conduct "may be fairly regarded as state action." *Id.*, at 71.

As to the second test, the so-called "state compulsion test," in order to establish that a private party is a state actor, "a plaintiff must demonstrate a particularly close tie between the [municipality] and the private party's conduct, such that the conduct may fairly be regarded as state action." *Id; see also Jarvis*, 805 F.3d at 12 ("Traveling this route demands that an inquiring court ask whether the state has used coercive power or has provided such a substantial degree of encouragement that the private party's decision to engage in the challenged conduct should fairly be attributed to the state."). As pointed out by Defendants, in analyzing whether in this case CMTM's conduct can be fairly regarded as state action, the focus is on *the alleged wrongful conduct. Id.* (the "inquiry is a targeted one, with the challenged conduct at the hub of the analytical wheel."). In this case, CMTM's alleged wrongful conduct is terminating Bruce in violation of his right to free speech. The undisputed factual record establishes that the decision to terminate Bruce was made solely by CMTM with no input from WRTA. While Bruce speculates that WRTA must have been involved, he cites to no facts that the WRTA exercised coercive power, significantly encouraged Bruce's termination, or was otherwise meaningfully involved in CMTM's decision to terminate him. Thus, CMTM cannot be found to be a state actor under the state-compulsion test. *See Barris-Velazquez v. Asociacion. de Empleados del Estado Liber Asociado de Puerto Rico*, 84 F.3d 487, 492 (1st Cir. 1996)(private entity's conduct not actionable

---

route's on behalf of the WRTA. Bruce's suggestion that determining who can represent or speak for the WRTA is traditionally a state function is a misapprehension of the public function test and warrants no further discussion.

under Section 1983 if challenged action results from exercise of private choice and not state influence or coercion).[9]

To satisfy the third test, *i.e.,* the intertwinement theory, "a plaintiff must show that the private party's actions are attributable to the state through a symbiotic relationship between the two. The requisite nexus is premised on a showing of mutual interdependence.

> To establish state action through this route, a plaintiff must show that the state has 'so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in [the challenged activity].' The relevant inquiry demands a deep dive into the totality of the circumstances, with heightened attention to certain specific factors. Those factors include whether the private party is (or is not) independent from the state in conducting its day-to-day affairs, whether the private party has shared profits generated from its challenged conduct with the state and whether the private party has used public facilities.

*Jarvis*, 805 F.3d at 8–9 (quoting *Santiago,* 655 F.3d at 68)(internal citations omitted). Whether there was sufficient intertwinement between WRTA and CMTM to warrant a finding that CMTM can be deemed a state actor cannot be determined on this record. As noted, the determination is based on a detailed factual inquiry including whether the parties behave independently in conducting day-to-day business affairs, whether they share profits, and whether CMTM uses public facilities. While WRTA owns the facilities and busses utilized by CMTM in its daily operations, both Bruce and CMTM make speculative and conclusory allegations regarding facts which are relevant to making a definitive finding regarding the roles played by WRTA and CMTM in the day-to-day operations, as to each entities role in the collective bargaining process, profit sharing and use of other equipment. Accordingly, the Court finds that there is a genuine issue of material fact regarding whether CMTM is a state actor under the joint

---

[9] Bruce focuses his argument not on whether the WRTA played a role in Bruce's termination but rather on WRTA's policies regarding who was authorized to speak to the media on behalf of WRTA. While WRTA set policies on who could speak to the media on its behalf, Bruce has not cited to any evidence in the record which would support a finding that it directed, influenced or played any role in the conduct at issue, *i.e.,* the decision to terminate him.

action/intertwinement test and CMTM's motion for summary judgment on the issue of whether it can be deemed a state actor for purposes of Section 1983 is denied.

Whether Bruce has Stated a Claim under the MCRA

The MCRA is the state "counterpart" to Section 1983 and, in general, is coextensive therewith. There are two primary differences: (1) the offensive conduct need not be attributable to a state actor; and (2) to succeed on an MCRA claim, a plaintiff must also show that the violation of rights occurred "by threats, intimidation or coercion." *Bally v. Northeastern Univ.,* 403 Mass. 713, 532 N.E.2d 49, 52 (1989); *see also* Mass. Gen. L. ch. 12, § 11I. On the record before the Court, as a matter of law, there is no evidence to support a finding that Bruce's constitutional rights were violated by means of threats, intimidation and coercion. Accordingly, Defendants' motion for summary judgment on Bruce's MCRA claim is *granted*.

**Conclusion**

1. Defendants' Second Joint Motion For Summary Judgment (Docket No. 120) is ***granted,*** in part, and ***denied,*** in part; and

2. Plaintiff's Motion For Leave To Supplement Record (Docket No. 135) is ***denied***.

**So Ordered:**

/s/ *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**SENIOR DISTRICT JUDGE**